UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Isidro Baricuatro, Jr., Bonifacio Carreon, Joel Franco, Saxon Gannod, Ferdinand D. Garcia, Welson Gorom, Rodelio Maligo, Adrian Payagan, Erwin A. Realin, Josue Rabadan, Marcelo Relota, Roseller Manuel, Armando Chumacera, Rogelio Calagos, Alberto Arcilla, Butch Era Perez, and Daniel Acierto | CIVIL ACTION<br><br>NUMBER: |
|                 Plaintiffs | SECTION<br>MAG. DIV. |
| — versus— | |
| Industrial Personnel and Management Services, Inc, D & R Resources, LLC, Grand Isle Shipyard, Danilo N. Dayao, Randolph F. Nunez Malagapo, Pacific Ocean Manning Incorporated, V People, Inc., and Thunder Enterprises, Inc. | <u>JURY TRIAL</u> |
|                 Defendants | |

## COMPLAINT

NOW INTO COURT come Plaintiffs, Isidro Barciuatro, Jr., Bonifacio Carreon, Joel Franco, Saxon Gannod, Ferdinand D. Garcia, Welson Gorom, Rodelio Maligo, Adrian Payagan, Erwin A. Realin, Josue Rabadan, Marcelo Relota, Roseller Manuel, Armando Chumacera, Rogelio Calagos, Alberto Arcilla, Butch Era Perez, and Daniel Acierto, appearing through undersigned counsel, and respectfully represent:

## I.   JURISDICTION AND VENUE

_____1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. § 1595(a) (civil trafficking).  The Court has supplemental jurisdiction over the state law causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal law claims.

2.      Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

3.      Venue is also proper in this District pursuant to 18 U.S.C. § 1965(a) because some or all of defendants reside, are found, have agents, and/or transact his/her/its affairs in the Eastern District of Louisiana.

## II.   PARTIES

_____4.      Plaintiffs herein are Isidro Barciuatro ("Barciuatro"), Boniface Carreron ("Carreron"), Joel Franco ("Franco"), Saxon Gannod ("Gannod"), Ferdinand Garcia ("Garcia"), Welson Gorom ("Gorom"), Rodelio Maligo ("Maligo"), Adrian Payagan ("Payagan"), Erwin Realin ("Realin"), Josue Rabadan ("Rabadan"), Marcelo Relota ("Relota"), Roseller Manuel ("Manuel"), Armando Chumacera ("Chumacera"), Rogelio Calagos ("Calagos"), Alberto Arcilla ("Arcilla"), Butch Era Perez ("Perez"), and Daniel Acierto ("Acierto").  They are persons of full age of majority and citizens of the Philippines, and currently reside in the state of Louisiana, and/or resided in the state of Louisiana at the time of the events giving rise to this lawsuit.

5.      Defendants herein are:

a.      Industrial Personnel and Management Services, Inc. ("IPAMS"), a corporation organized under the laws of the Philippines that maintains its principal place of business in Manila, Philippines.  IPAMS is engaged in the business of recruiting laborers from the Philippines for employment in the United States.  IPAMS is authorized by the Philippine Overseas Employment Administration to recruit Philippino nationals for overseas employment.  IPAMS, acting on behalf of, in the interest of, in partnership and/or in conjunction with D & R Resources, Inc., recruited Plaintiffs Franco, Gannod, Garcia, Gorom, Maligo, Payagan, Realin and Relota for employment in Louisiana.

b.      D & R Resources, LLC ("D & R"), a corporation organized under the laws of the state of Louisiana, with its main office and principal place of business located at 18838 Highway 3235, Galiano, Louisiana.  Fifty (50%) per cent of the company is owned, operated, and/or controlled by Defendants, Danilo N. Dayao and Randolph Nunez Malagapo.  The other fifty (50%) per cent of the company is owned by Thunder Enterprises.  D & R was formed for the sole and singular purpose of meeting the legal requirements for obtaining E2 visas and/or facilitating the hiring, employing and/or placing of workers from the Philippines, particularly Plaintiffs Franco, Gannod, Garcia, Gorom, Maligo, Payagan, Realin and Relota with Defendant, Grand Island Shipyard, Inc.  Individually, and or collectively, they obtained the E-2  visas required for Plaintiffs to be employed in the United States.

c.      Danilo N. Dayao  ("Dayao") and Randolph Nunez Malagapo ("Malagapo") are persons of full age of majority and citizens of the Philippines.  They own, operate, manage and/or control D & R.  Further, they own fifty (50%) per cent of D & R; the remaining 50% is owned by Thunder Enterprises.  Individually, and/or through their various companies, and/or in cooperation with Defendant, Grand Isle Shipyard, they obtained E-2 visas required for Plaintiffs Franco, Gannod, Garcia, Gorom, Maligo, Payagan, Realin and Relota to be employed as welders and fitters in the United States.

d.      Grand Isle Shipyard, Inc. ("GIS") is a Louisiana corporation authorized to and presently doing business in the state of Louisiana.   In cooperation with Defendant, D & R, it obtained E2 visas required for Plaintiffs Franco, Gannod, Garcia, Gorom, Maligo, Payagan, Realin and Relota to be employed as welders and

fitters in the United States.  In further cooperation with Defendant, V-People, it obtained E2 visas for Plaintiffs Baricuatro and Carreon to be employed as welders and fitters in the United States.

e.   Pacific Ocean Manning Incorporated (POMI), a corporation organized under the laws of the Philippines, with its principal place of business in Manila, Philippines.  POMI is engaged in the business of recruiting welders and fitters from the Philippines for employment in the United States.  POMI, acting on behalf of, in the interest of, in partnership and/or conjunction with V People and GIS, recruited Plaintiffs Relota, Carreon, Rabadan, Manuel, Chumacera, Calagos, and Arcilla for employment in Louisiana.

f.   V People, Inc. ("V-P"), a corporation organized under the laws of the Philippines that maintains its principal place of business in the state of Texas.  V-P is engaged in the business of recruiting laborers from the Philippines for employment in the United States. Individually, and/or in cooperation with Defendant, GSI, they obtained the E-2 visas required for Plaintiffs Relota, Carreon, Rabadan, Manuel, Chumacera, Calagos, and Arcillas to be employed as speciality welders and fitters in the United States.

g.   Thunder Enterprises, Inc. ("Thunder"), a corporation organized under the laws of and presently doing business in the state of Louisiana.  It acts through, and in conjunction with, D & R, GIS, POMI and V-P to hire Filipino speciality welders and fitters for employment in the United States, particularly Louisiana.

## III.  STATEMENT OF FACTS

**A.   Factual Allegations Related to Laws Regulating the Recruitment of Philippine Nationals for Employment within Louisiana.**

**I.      Regulation of the Philippine Overseas Employment Administration**

6.   In the Philippines, the Philippine Overseas Employment Administration ("POEA"), a government entity, regulates the recruitment of nationals from the Philippines to work abroad.

7.   The POEA requires any person, partnership, or corporation engaged in the

recruitment and placement of workers abroad for a fee, which is charged directly or indirectly to the workers or employers or both, to obtain a license from the POEA.

8.     The POEA refers to any person, partnership, or corporation, as defined in ¶ 8, *supra,* as a "Private Employment Agency."  *See* Rule 2(22), POEA Rules and Regulations Governing the Recruitment of Land-Based Overseas Workers.

_____9.     The POEA's rules and regulations state that unless otherwise provided, the employer will be responsible for the payment of the visa fee, airfare, POEA processing fee, and the Philippine Overseas Workers Welfare Administration membership fee.  *See* POEA Rule 5, Section 2

_____10.     The POEA's rules and regulations prohibit employment agencies from charging more than one month's salary for workers for whom the agencies acquire overseas employment. Documentation costs, including authentication costs, may also be charged to the worker. However, the POEA's rules and regulations provide that no other charges in whatever form, manner, or purpose shall be imposed on or paid by the worker without approval from the POEA. *See* POEA Rule 5, Section 3.

## II.     Federal United States Regulations of the United States Government regarding H-1B Visa Workers.

11.     The Immigration and Nationality Act ("INA") § 101(a)(15)(E) provides that individuals from nations with whom the United States has a reciprocal treaty may enter the country with either an E-1 (Treaty Trader) or an E-2 (Treaty Investor) in order to develop businesses.  The United States presently has such treaties with 79 countries.

12.     An individual entering with an E-2 visa must enter "solely to develop and direct

the operations of an enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing, a substantial amount of capital." *See* INA § 101(a)(15)(E)(ii). Nationals of the treaty country must own at least 50 percent of the business in question. *See* 22 CFR 41.51(c)(2).

13.     E-2 visas can be available to "essential personnel" of a treaty investor. *See* 22 C.F.R. § 41.51.  In order to qualify, the alien must be of the same nationality as the employer, and he or she must possess very specialized skills that are essential to the operation of the treaty investor's enterprise. *See* 62 Fed. Reg. 48144 (September 12, 1977).  The employer must demonstrate, not only that the alien possesses such specialized skills, but also that there is a shortage of United States workers available to perform the task. *Id.*

14.     The primary E-2 holder-employer has complete control over the process by which an alien can obtain an E-2 visa as essential personnel.  The employer must file a Form DS-160 with the American consulate where the employee resides. *See* Fed. Reg. 23067 (April 29, 2008). The applicant must also submit the DS-156E supplement form part I, II, and III; proof of the company's substantial trade or investment; a business plan; and a letter describing the company's business, the position the foreign national will fill, and his or her qualifications.

15.     An E-2 essential employee may only work in the United States in the activity for which he or she was approved to work in at the time the visa is granted. *See* 8 CFR 214.2(e)(8)(ii).  Though aliens may work for parents or subsidiaries of the company for which they were initially approved, any change to a new employer will result in the alien's failure to maintain E-2 status. *Id.*  The employee is therefore dependent upon the employer to obtain and maintain his or her legal status in the United States.

### III.    Regulations of the Louisiana Workforce Commission

16.    The Louisiana Workforce Commission administers the Louisiana Private Employment Services law, La. R.S. 23:101, *et seq.* (hereinafter referred to as "LPES").

17.    The LPES provides that any person, company, corporation, or partnership must be licensed by the Louisiana Workforce Commission before it may operate, solicit, or advertise as an employment service within Louisiana.

18.    The LPES provides that any contract between an employment service and an applicant or candidate must first be approved by the Louisiana Workforce Commission.

19.    The LPES provides that any fees charged by an employment service must be based on a schedule of fees as applied to the applicant's projected first year's gross earnings.

20.    Regulations implementing the LPES provide that an employment service may not charge or receive a fee from an applicant prior to the actual commencement of work on a job procured by the employment service.

### IV.    Factual Allegations Relating to Trafficking Scheme Involving IPAMS, D & R, and GSI

21.    Plaintiffs Franco, Gannod, Garcia, Maligo, Payagan, Realin and Relota, via advertisement and/or word-of-mouth, became aware of the fact that IPAMS was recruiting Filipino welders and fitters to work abroad, particularly, but not exclusively, in the United States. Upon further inquiry, they discovered that IPAMS was recruiting for and in behalf of D & R. Plaintiffs subsequently discovered that D & R needed employees to fulfill its contractual commitment to GSI, who needed workers possessed of Plaintiffs' skills and expertise, to assign to the various projects being operated by GSI.

22.     Plaintiffs submitted applications with IPAMS.  They were interviewed and required to undergo a trade test, to determine whether they possessed the requisite skills.   During the course of the interview, they were told, *inter alia,* that, if hired, they would be provided transportation to the United States, housing, food, and would be compensated at an hourly rate of $16.25 for regular time, and $24.37 an hour for overtime.  Also, Plaintiffs were told that they would receive an E2 visa, which would allow them to work in the United States for five (5) years, and eventually the would obtain a green card or permanent residency.

23.     Upon successful completion the trade and medical tests, Plaintiffs were informed that they had to go to the United States Embassy in Manila, to be interviewed.  IPAMS provided them with the required forms to present to the interviewer, which included the offer of employment by IPAMS, acting in behalf of D & R.  Inexplicably, the offer of employment provided to the United States Embassy official was different from the ones signed by Plaintiffs at the office of IPAMS.

24.     Plaintiffs successfully completed the interview process and were given E2 visas to enter the United States, to work on the various GSI projects.

**V.     Factual Allegations Relating to Trafficking Scheme Involving V-P, D & R, and GSI**

25.     Plaintiffs Relota, Carreon, Rabadan, Chumacera, Manuek, Calagos and Arcilla, similar to Plaintiffs Franco , Baricuatro and Carreon, similar to Plaintiffs Franco, Gannod, Garcia, Maligo, Payagan, Realin and Relota, became aware, via advertisement and/or word of mouth, that an agency was recruiting Filipino welders and fitters to work abroad, particularly, but not exclusively, in the United States.  In this instance, the recruiter was POMI, not IPAMS.

Subsequently, they discovered that workers were being recruited for V-P, who needed workers to fulfill its commitment to GSI, to provide workers for the various projects being operated by GSI.

26.    Plaintiffs submitted applications with POMI.  They were interviewed and required to undergo a trade test, to determine whether they possessed the requisite skills.   During the course of the interview, they were told, *inter alia,* that, if hired, they would be provided transportation to the United States, food and housing, and would be compensated at an hourly rate of $16.25 for regular time, and $24.37 an hour for overtime.  Also, Plaintiffs were told that they would receive an E2 visa, which would allow them to work in the United States for five (5) years.

27.    Upon successful completion of the trade and medical tests, Plaintiffs were informed that they had to go to the United States Embassy, in Manila, to be interviewed.  POMI provided them with the required forms to present to the interviewer, which included the offer of employment by V-P, acting on behalf of GIS.  Inexplicably, the documents evidencing the offer of employment provided to the United States Embassy official were appreciably different from the ones executed by Plaintiffs at the office of V-P.

28.    Plaintiffs successfully completed the interview process and were given E2 visas to enter the United States.

**VI.    Executions of Separate Contracts**

29.    Plaintiffs Baricuatro, Franco, Gannod, Garcia, Maligo, Payagan, Realin, Relota, Carreon, Rabadan, Manuel, Chumacera, Calagos and Arcilla, although they applied for work through separate agencies, they were nonetheless victims of the same unlawful conduct.

30.     Plaintiffs Baricuatro, Franco, Gannod, Maligo, Payagan, Realin and Relota, were required by IPAMS and D & R to execute two separate contracts, containing different terms. One contract was maintained by IPAMS and D & R, and, pursuant to instructions from IPAMS and D & R, a different contact was provided to the officials at the U.S. Embassy.  The major difference between the two contracts pertained to the wage rate.  The one provided to the U. S. Embassy set forth the prevailing wage rate, the rate required for the employment agreement to meet with the required approval.  Whereas, on the other hand, the contract maintained by IPAMS and D & R provided a wage rate significantly below the prevailing rate.

31.     Plaintiffs  Baricuatro and Carreon were required by V-P and D & R to execute two separate contracts, containing different terms.  One contract was maintained by V-P and D & R, and, pursuant to instructions from V-P and D & R, a different contact was provided to the officials at the U.S. Embassy.  The major difference between the two contracts pertained to the wage rate.  The one provided to the U. S. Embassy set forth the prevailing wage rate, the rate required for the employment agreement to meet with the required approval.  Whereas, on the other hand, the contract maintained by V-P and D & R provided a wage rate significantly below the prevailing rate.

32.     The contracts were procured through fraud and misrepresentation.   IPAMS, POMI, D &R, POMI, and V-P, compelled, coerced, deceived, and/or used other deceptive and/or unlawful methods to procure Plaintiffs' signatures on the illegal contracts.

33.     Plaintiffs executed the contracts because they believed that, in order to work in the United States, they had no choice.  Further, they were deceived and/or otherwise fraudulently

induced to sign the contracts with the promise that GIS would sponsor them for E-2 visas, making them eligible for permanent resident status.

34.     Based on information and belief, the contract(s) were not pre-approved by the Louisiana Workforce Commission.

**VII.   Inadequate and Exorbitant Housing and Food Arrangement Dictated by D & R and GIS**

35.     Plaintiffs were not allowed any input whatsoever in the selection of housing. Actually, they were expressly discouraged and/or prohibited from exercising any input.

36.     Upon Plaintiffs' arrival to Louisiana, they were taken to Galliano, Louisiana, where they were assigned to a bunk house, four persons to a room.  The bunk house was located at a facility owned by GIS. They were charged $3,200 a month per person, even if they did not stay there.   The amount for housing was automatically deducted from their paychecks absent their consent.

37.     Subsequently they were relocated to Lafitte, Louisiana, where they were assigned to a barge.  They were housed in a room 10 x 10, with six workers assigned to a room, and forced to sleep on racks.  They were charged $2,000.00 to $3,000.00 per month, based on their earnings. Inexplicably, the more they earned, the more they were charged for the rack.

38.     In addition to being charged for housing, they were compelled to pay for their own food.

39.     Pursuant to the terms of the contract(s), "free food and housing [would] be given at the onshore site."  Neither was provided by D & R or GIS.

**VIII.   Housing Discrimination**

40.      D & R and GIS showed preferential treatment in favor of American workers with respect to food and lodging.

41.      American workers, by and large, were not required to pay for housing.  Further, they were given their preference of the sleeping accommodations.  To the extent that they were charged, it was at a rate significantly different from that which Plaintiffs were being charged.  If a Philippine national were assigned to the lower bunk, he would be required to relinquish to an American worker, if he requested it.

**IX.   Withholding of Documents**

42.      D & R retained Plaintiffs' social security cards.  They were informed by Dayao and Malagapo that the cards would be retained by them until the end of five years, which was the duration of the E2 visa.   Plaintiffs, after objecting to the retention of their social security cards, were given a copy of them, not the originals.  By retaining and/or refusing to surrender Plaintiffs' social security card, D & R sought to exert full and complete control over Plaintiffs existence during their tenure in the United States.

43.      Upon expiration of Plaintiffs' contract, they were returned to the Philippines. Within seventy-two hours of their return to the Philippines, there were required to surrender their passports containing their visas to IPAMS and POMI.  The passports were returned only if Plaintiffs returned to the United States, to work for D & R, GIS and V-P.

44.      Plaintiffs' passports and visas are extremely important to them.  They are overseas workers and, without those documents, they are effectively precluded from obtaining overseas

employment.  This fact was well known to D & R, POMI, and IPAMS.   They were retained to restrict, if not altogether prevent, Plaintiffs' freedom of movement.

### X.   Inadequate Compensation

45.     Pursuant to the terms of the agreement prepared by IPAMS and POMI and given to Plaintiffs to provide to the United States Embassy, Plaintiffs were scheduled to earn $16.26 per hour regular time, and $24.37 for overtime.

46.     Plaintiff oftentimes worked seven days a week, 10-12 hours per day, but the compensation received did not equal the hours worked.   Plaintiffs were paid a little as $5.50 per hour, woefully short of the agreed upon amount.

47.     When Plaintiffs inquired as to the pay discrepancy, they were threatened with deportation.  Further, they were threatened with being reported to POEA, placed on a "blacklist", and barred from future overseas employment.

48.     When Plaintiffs Maligo and Payagan voiced objections to the pay deficiencies, D & R and GIS proceeded to immediately purchase airplane tickets for them to return to the Philippines.  In order to avoid this drastic decision, they escaped.

### XI.   Others Acts of Intimidation, Coercion and Manipulation

49.     On several occasions Plaintiffs were compelled to perform work that was clearly outside the scope of their visa status.  For instance, Plaintiff Maligo was compelled to work as a tile setter, which was not covered under his E2 visa.

50.     Plaintiff were kept in virtual peonage.  They were prohibited from going to the store alone.  If they wanted to go to Walmart, they had to be accompanied by an American employee, and they had to return within one hour.

51.     Plaintiffs were prohibited from socializing with the American workers and Filipino nationals residing in the area.

52.     Plaintiffs were dissuaded and/or prohibited from applying for, and obtaining, state issued documents: identification cards, driver's licenses, and twic cards.

53.     Plaintiffs were prevented from applying for, and obtaining, benefits to which they were entitled, e.g., twic card.  They were also told that it was illegal for them to obtain a driver's license.  This was done to restrict Plaintiffs' freedom of movement and to prevent them from leaving.

54.     Plaintiffs were instructed to sign documents, and when they inquired as to the nature of the documents, they were told not to ask any questions.   Based on information and belief, some of those were documents associated with Plaintiffs' income tax return.  After Plaintiffs escaped their condition of involuntary servitude, they applied for an income tax refund, since they had in fact paid taxes.   They were informed that they someone else had already applied for, and received, the refund.

**XII.   Continued Presence Status**

55.     Plaintiffs, individually and jointly, escaped from the condition of involuntary servitude under which they were confined.

56.     Plaintiffs, believing that Defendants' conduct and actions were contrary to the laws of the United States and state of Louisiana, sought the assistance of the Catholic Charities of New Orleans.  With the assistance of Catholic Charities of New Orleans, they sought, and obtained, Continued Presence status from the United States Department of Homeland Security, as victims of a severe form of human trafficking.

## IV.   CLAIMS FOR RELIEF

### a.   Authority for a Civil Action

57.     Plaintiffs are victims of the following violations of Title 19, Chapter 77 of the United States Code, 18 U.S.C. §§ 1589, 1590, 1592, and 1594(a) and (b).

58.     Plaintiffs are authorized to bring this civil action against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), which states in 18 U.S.C. § 1595(a) that Plaintiffs may bring a civil action against the perpetrators of these violations and "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in a "violation" of these provisions.

59.     Defendants were perpetrators of the violations of 18 U.S.C. §§ 1589, 1590, 1592, and (1594)(a), and 1594(b).

60.     Defendants knowingly benefitted, financially or by receiving anything of value from participation is a venture which each Defendant knew or should have known engaged in violations of  18 U.S.C. §§ 1589, 1590, 1592, and (1594)(a), and 1594(b).

### b.   Forced Labor (18 U.S.C. § 1589)

61.     Defendants knowingly attempted to and did subject Plaintiffs to forced labor in violation of 18 U.S.C. § 1589.

62.     Defendants knowingly attempted to and did by means of force, threat of force, physical restraint, and/or threats of physical restraint obtained and/or retain the labor and services of Plaintiffs in violation of 18 U.S.C. §1589(a)(1).

63.     Defendants knowingly attempted to and did obtain the labor and services of Plaintiffs by using a scheme, plan, or pattern which, in the totality of the circumstances, amounted to a threat of serious harm to the Plaintiffs if they were to leave the employ of Defendants in violation of 18 U.S.C. § 1589(a)(2).

64.     Defendants knowingly attempted to and did threaten Plaintiffs with deportation and deceived Plaintiffs about the terms of their visas, as well as promised green cards in order to obtain the labor and services of the Plaintiffs, which constitutes an abuse of the legal process in violation of 18 U.S.C. § 1589(a)(3).

65.     Defendants isolated Plaintiffs and forced them to live in conditions causing psychological harm, as well as used discrimination in violation of 42 U.S.C. § 1981 in order to coerce Plaintiffs into believing that they would suffer serious harm if they were to leave Defendants' employ.

66.     Plaintiffs suffered injury as a proximate result of these actions.

### c.  Trafficking with Respect to Peonage, Slavery, involuntary Servitude, or Forced Labor (18 U.S.C. § 1590)

67.     Defendants recruited and transported Plaintiffs for labor and services in violation of 18 U.S.C. §§1589, 1592, 1594(a) and 1594(b).

68.     Defendants knowingly benefitted financially from participation in a venture which they knew or should have known was engaged in acts set forth in this Complaint.

### d.  Unlawful Conduct with Respect to Documents in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor (18 U.S.C. § 1592

69.     As set forth in the Complaint, Defendants knowingly removed, confiscated, and

possessed Plaintiffs' passports in the course of violating, and/or with the intent to violate 18 U.S.C. §§ 1589 and 1594(a).

70.     Defendants knowingly benefitted financially from participation in a venture which they knew or should have known was engaged in the prohibitive acts set forth in this Complaint, preventing Plaintiffs from seeking other work overseas.

**e.   Attempt to Violate 18 U.S.C. §§ 1589 and 1590 (18 U.S.C. § 1594(a)**

71.     Defendants attempted to and did violate 18 U.S.C. §§ 1589 and1590, n violation of 18 U.S.C. § 1594(g).

72.     Defendants knowingly benefitted financially from participation in a venture which Defendant knew or should have known was engaged in the prohibited acts set forth in this Complaint.

**f.   Conspiracy to Violate 18 U.S.C. §§ 1589 and 1590 (18 U.S.C. § 1594(a))**

73.     Defendants did conspire with each other to violate 18 U.S.C. §§ 1589, 1590, and 1592 in violation of 18 U.S.C. § 1594(b).

74.     Defendants knowingly benefitted financially from participation in a venture which Defendant knew or should have known was engaged in the prohibited acts set forth in this Complaint.

**g.   Alternatively, Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor by Violating 18 U.S.C. §§ 1589 (2003) and 1594(a) (2003) (18 U.S.C. § 1590 (2003)**

75.     Alternatively, in violation of 18 U.S.C. § 1590 (2003), and in addition to the violations of 18 U.S.C. § 1589 (2003) as set forth above, Defendants knowingly recruited, transported, harbored, and/or obtained Plaintiff's labor or services in furtherance of the following

violations of Title 18, Chapter 77 of the U.S. Code:

        a.     Removing, confiscating, or possessing Plaintiffs' and passports and other

immigration documents in the course of, or with the intent to violate 18 U.S.C. §§ 1589 (2003)

and 1590 (2003), in violation of 18 U.S.C. §§ 1592(a) (2003); and

        b.     Attempting to violate 18 U.S.C. §§ 1589 (2003) and 1590 (2003), in

violation of 18 U.S.C. § 1594(a) 2003.

       76.     Alternatively, in violation of 18 U.S.C. § 1590 (2003), and in addition to the

violation of 18 U.S.C. § 1589 (2003), as set forth above, Defendants, IPAMS, D & R, Dayao and

Randolph Nunez Malagapo, and POMI, knowingly recruited, transported, harbored and/or

obtained Plaintiffs for labor services in furtherance of Defendants' GIS, D & R, and V-P interests

in violations of the following provisions of Title 18, Chapter 77 of the United States Code: 18

U.S.C. §§ 1589(2003), 1590 (2003), and 1594(a) (2003).

### h.  Damages

       77.     As a proximate result of the conduct of Defendants, Plaintiffs have suffered

injuries to their persons, businesses, and property, and other damages.

       78.     Plaintiffs are entitled to recover compensatory and punitive damages in an amount

to be proven at trial, including attorney's fees.

### SECOND CLAIM FOR RELIEF

       79.     Plaintiffs re-allege and incorporate by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

       80.     The actions of Defendants, as set forth herein, violated Plaintiffs' rights to receive

full and equal benefit of all laws guaranteed by 42 U.S.C. § 1981, including Plaintiffs' right to

enjoy and benefit from non-discriminatory employment relationships with Defendants.

81.    Specifically, Defendants subjected Plaintiffs to discriminatory and offensive mandatory room and board arrangements at various GIS facilities, including a mandatory curfew, intended to restrict and belittle Plaintiffs.

82.    Defendants did not subject its non-Filipino and/or U.S. citizens to the same exorbitant housing fees which were charged the Filipino workers, and it required only Filipino workers to sacrifice beds in the housing facilities to the United State workers.

83.    As set forth in the preceding paragraphs, Defendants maintained an objectively hostile and abusive work environment through the actions of its personnel referring to and/or directed at Plaintiffs on account of their race and/or alien status.

84.    As set forth in the preceding paragraphs, Defendants' discriminatory and offensive treatment of Plaintiffs was sufficiently severe that it created a hostile work environment in violation of 42 U.S.C. § 1981.

85.    Plaintiffs reasonably perceived their work environment to be hostile, abusive, and discriminatory on the basis of their race and/or alien status.

86.    Defendants knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs of their rights.

87.    As a proximate result of the conduct of Defendants, Plaintiffs have suffered injuries to their persons, businesses, and property, and other damages.

88.    Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including attorney's fees.

### THIRD CLAIM FOR RELIEF

_____89.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

90.    Plaintiffs assert this claim pursuant to 42 U.S.C. § 1985(3) for injunctive relief, declaratory relief, and damages against Defendants.

91.    As set forth in the preceding paragraphs, the Defendants conspired, agreed, planned and coordinated for the purpose of depriving Plaintiffs of equal protection of their rights under the Thirteenth Amendment to the United States Constitution and its implementing and enforcing statutes, *inter alia,* 18 U.S.C. §§ 1589, 1590, to be free from forced labor, involuntary servitude, and trafficking in persons.

92.    As set forth in preceding paragraphs, Defendants, individually and through their agents, employees, and/or representatives, knowingly and/or negligently made materially false and untrue statements and representations to Plaintiffs regarding the nature and terms and conditions of employment and opportunities for immigration status, employment in the United States, and the amount and nature of compensation for Plaintiffs' work in the United States.

93.    Defendants intended to induce Plaintiffs to pay the large fees demanded by Defendants through the false statements made by Defendants and/or their agents, employees, and/or representatives.

94.    Defendants intended to persuade Plaintiffs to leave their homes and jobs in the Philippines through the false statements made by Defendants and/or their agents, employees, and/or representatives.

95. Plaintiff reasonably relied on the representation of Defendants and their agents, employees, and/or representatives and had no reason to believe that these representations were false.

96. Plaintiffs were entitled to rely on Defendants' representations.

97. As a proximate result of the conduct of Defendants, Plaintiffs have suffered injuries to their persons, businesses, and property, and other damages.

98. Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be prove at trial.

### FOURTH CLAIM FOR RELIEF

99. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

100. Plaintiffs assert this claim for damages and declaratory relief pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*

101. Defendants violated 29 U.S.C. § 206 by failing to pay Plaintiffs the applicable minimum wage for every compensable hour of labor they performed.

102. Defendants violated 29 U.S.C. § 207 by failing to pay Plaintiffs the applicable overtime wage for every compensable hour of overtime labor performed.

103. Defendants' failure to pay Plaintiffs their federally mandated minimum and overtime wages was willful violations of the FLSA within the meaning of 29 U.S.C. 255(a).

104. As a consequence of Defendants' violations of the FLSA, Plaintiffs are entitled to recover their unpaid minimum and ovretime wages, plus an additional equal amount in liquidated damages, costs of suit, and reasonable attorneys fees pursuant to 29 U.S.C. § 216(b).

## V.  JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

## VI.  PRAYER

Plaintiffs pray that there be judgment herein in favor of Plaintiffs, and against

Defendants, declaring and decreeing that Defendants violated Plaintiffs' rights, as set forth

herein, entitling Plaintiffs to an award of general compensatory and punitive damages, togther

with costs, including reasonable attorney's fees.


Respectfully submitted:

  /s/   Ronald L. Wilson
RONALD L. WILSON (#13575)
701 Poydras Street - Suite 4100
New Orleans, Louisiana 70130
PH: (504) 525-4361
FAX: (504) 525-4380
Email: cabral2@aol.com


DAVID A. DALIA (#01320)
830 Union Street – Suite 302
New Orleans, LA.  70112
PH: (504) 524-5541
FAX: (504) 525-0449
Email: david@dalia-law.com


COUNSEL FOR PLAINTIFFS