IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ISIDRO BARICUATRO, JR., ET AL.<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>INDUSTRIAL PERSONNEL AND<br>MANAGEMENT SERVICES, INC., ET AL.<br><br>　　Defendants. | **CLASS ACTION/**<br>**COLLECTIVE ACTION**<br><br>Civil Action No.: 2:11-cv-02777-KDE-JCW<br><br>**REPLY IN SUPPORT OF MOTION**<br>**FOR CONTEMPT AND SANCTIONS**<br><br>District Judge Section "N":<br>Judge Kurt D. Engelhardt<br><br>Mag. Judge Division 2:<br>Mag. Judge Joseph C. Wilkinson, Jr. |

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CONTEMPT AND FOR SANCTIONS

Plaintiffs file this Reply Memorandum in Support of Plaintiffs' Motion for Contempt and Sanctions, (Rec. Doc. 321), and show as follows:

### INTRODUCTION

Defendants made no attempt to controvert the evidence proving their most brazen violations of the Court's Order – namely, the denial of certificates of employment, work verifications, and immigration documents to Plaintiffs who joined in this lawsuit.[1] Withholding documents and demanding that releases be signed before returning them is threatening, coercive, intimidating, and a clear violation of the Court's Order.

Instead, the Defendants attempted to justify – not deny – certain violations of the Court's Order. For instance, Defendants D&R Resources, L.L.C. ("D&R"), Danilo Dayao, and Randolf

---

[1] As evidenced by the dates of the violations, as well as the dates counsel brought these matters to Defense counsel's attention, it is clear that Plaintiffs' motion is not a response to that of the Plaintiff, but had its origins well before Defendants sought sanctions. See Rec. Doc. 321-2.

1

Malagapo claim, "Providing certifications of employment to workers was causing D&R Resources difficulty in fulfilling their manpower requirements."[2] Malagapo also testifies that the "blacklist" of Plaintiffs simply reminded employees of D&R and Grand Isle Shipyard, Inc. ("GIS) who the Plaintiffs were and who, therefore, they could not discuss the litigation with. Rec. Doc. 333-1 at ¶¶ 33-38. There is, however, no logical reason to keep a list for such a purpose. The Order of this Court clearly prohibits Defendants from speaking with a named Plaintiff or Opt-in Putative Class-Member or potential Putative Class Member about any matter other than employment matters. Rec. Doc 119, p. 2. **All of Defendants' employees are "potential Putative class members" and Defendants are prohibited from discussing this litigation with *any* of them, whether they have opted-in to this suit or not.** The Declaration of Malagapo is an admission that Defendants may have been discussing this litigation matter with potential putative class members in violation of this Court's order.

Defendants also attempt to distract the Court from their violations by introducing a new defense, claiming that photos of smiling, singing Filipinos prove the Filipinos were happy with their work and living conditions.[3] Specifically, Defendants argue that pictures of workers outside the GIS compound prove the workers' freedom was not restricted.[4] However, the Declaration of Malagapo, which details his interrogation of Francisco Villanueva, proves the opposite. Rec. Doc. 333-1 at ¶¶ 9-27. Villanueva was fired for lying about going to a police station in his supposed "free time." *Id.* According to these Defendants, it seems workers were "free" to come and go as long as it was under the supervision, and with the permission, of GIS

---

[2] Rec. Doc. 333-1, Declaration of Randolf Malagapo, ¶ 59.
[3] *See, e.g.*, Rec. Doc. 333-1 at ¶¶ 6-8 (Declaration of Malagapo and the Exhibits attached thereto); Rec. Doc. 336 at p. 3; *see also, e.g.,* Rec. Doc. 312-3 at pp. 23-27 (Declaration of Malagapo in Support of Motion to Modify Protective Order and Impose Sanctions filed by **D&R, GIS, Thunder, Dayao, Malagapo, and Pregeant** and the Exhibits attached thereto).
[4] *Id.*

2

and D&R. *Id.* If a worker refused to disclose where he had been in his "free time," he could be fired. *Id.*

Finally, Defendants D&R, Dayao, and Malagapo attempt to discredit the testimony of Michael Dalire by submitting into the record powers of attorney, "which are kept in the normal course of business for D&R Resources." Rec. Doc. 333-1 at ¶ 50 (Declaration of Malagapo and Exhibit 13 referenced therein). Nowhere in Malagapo's Declaration does he declare that the powers of attorney were not forged. *See id.* at ¶¶ 48-50. Plaintiffs did not argue that the theft of tax refunds prior to 2012 violated the Order, but did offer the testimony of Michael Dalire, who testified that he was instructed to deny employment certifications and work verifications for Plaintiffs, and also testified that he was instructed to forge powers of attorney related to tax refunds. The testimony of Dalire is beyond reproach, as his allegations are proven by documentary evidence showing that Plaintiff's powers of attorney were *notarized in Louisiana while Plaintiffs were in the Philippines.*[5]

## ARGUMENT

**A.    The evidence of coercion, threats, and intimidation is uncontroverted.**

Defendants failed to deny numerous allegations that they withheld documents from Plaintiffs. The allegations include:

- Romeo Andrade's testimony that he was required to surrender his passport, Seaman's book and TWIC card to DNR in Manila, and was told that he would not receive his documents back until he signed a "quitclaim." Rec. Doc. 321-2, pp. 13-14.

---

[5] *See* Exhibit "1" (Declaration of Plaintiff Ferdinand Garcia) (Proving that Garcia was in the Philippines when he supposedly executed a Specific Power of Attorney assigning all of his rights in his tax refunds to D&R); *see also*, Exhibit "2" (Declaration of Plaintiff Adrian Payagan) (Proving that Payagan was in the Philippines when he supposedly executed: (1) a Specific Power of Attorney assigning all of his rights in his tax refunds to D&R; (2) an Internal Revenue Service Power of Attorney and Declaration of Representative Form 2848; and, (3) a Louisiana Department of Revenue Power of Attorney and Declaration of Representative Form.).

3

- Zosimo Barroga's testimony that he was denied his certificate of employment and told that the reason for doing so was because he filed suit. He was told he should sign a document "retracting" his complaint before he could get his certificate. Rec. Doc. 321-2, pp. 12-13.

- Camilo Algodon testified that Lestar Lumbar of DNR told him he needed to speak to DNR's lawyer to get his sea service records, and that Edmund Maxilmilian told him he could get his documents after he spoke with DNR's lawyer and "sign[ed] some documents." Rec. Doc. 321-2, pp.11-12.

This conduct is clearly intimidating, threatening, and coercive. The evidence is clear and direct that Defendants continually failed to comply with this Court's Order. *Bd. Of Supervisors of the Louisiana State Univ. v. Smack Apparel Co.,* 574 F.Supp. 2d 601, 604 (E.D. La. 2008). For example, Defendant DNR admits that "releases were signed by plaintiffs in the Philippines at various times throughout 2006-2012 and cover specific time periods. Rec. Doc. 335 at 5; 335-1 (Exhibit 1 referenced therein). For example, DNR submits that Avelino Tajonera (represented in this action by the Estate of Avelino Tajonera) signed a release of claims on July 31, 2012. Rec. Doc. 335-1 at 3. The Court's Order was entered on July 20, 2012. Rec. Doc. 119.

In light of Defendants' conduct, the remedies as enumerated in Plaintiffs' motion and memorandum – such as requiring production of all documents presented to or signed by any plaintiff or putative plaintiff since the start of this suit, the production of certifications of employment for all plaintiffs, and prohibiting Defendants from asking Plaintiffs or potential plaintiffs to sign releases – are justified and are tailored to remedy Defendants' violations. Rec. Docs. 321; 321-2 at pp. 19-20.

**B.     The "Happy Filipino" defense.**

Rather than address its violations of the protective order, Defendants D&R, GIS, Thunder Enterprises, Inc. ("Thunder"), Dayao, Malagapo, and Pregeant attempt to distract the Court by raising a tired and antiquated defense to Plaintiffs' factual allegations. In response to allegations

4

of unpaid personal servitude, restricted movement, underpayment, seizure of documents, and threats of deportation, these Defendants simply offer photographs of smiling, singing Filipinos. *See, e.g.*, Rec. Doc. 333-1 at ¶¶ 6-8 (Declaration of Malagapo and the Exhibits attached thereto); Rec. Doc. 336 at p. 3 (Opposition filed by GIS, Thunder, and Pregeant); *see also, e.g.,* Rec. Doc. 312-3 at pp. 23-27 (Declaration of Malagapo in Support of Motion to Modify Protective Order and Impose Sanctions filed by D&R, GIS, Thunder, Dayao, Malagapo, and Pregeant and the Exhibits attached thereto).  The "Happy Filipino" defense has been used time and again throughout the centuries, the only variation being the nationality or race of the person, to justify otherwise intolerable treatment.  According to the Defendants D&R, GIS, Thunder Enterprises, Inc., Malagapo, Dayao, and Pregeant the conditions on the GIS compound must be exaggerated, and the Filipinos could not have been too unhappy, because the Filipinos could be heard singing songs, laughing, and attending church services (which happened to be led by Malagapo and held at his house).  *See, e.g.*, Rec. Docs. 333; 333-1 at ¶¶ 6-8; Rec. Doc. 336 at 3; Rec. Doc. 312; 312-3 at pp. 23-27.

Photographs of smiling, singing Filipinos do not controvert any of the allegations that Plaintiffs were forced to perform unpaid personal servitude for executives, denied overtime, underpaid, had immigration documents seized, threatened with deportation, and/or were not truly free to come and go as they pleased.[6]  An examination of Malagapo's Declarations and the photos attached thereto shows the Plaintiffs were always supervised by Defendants.  In other words, Malagapo's Declarations actually prove that workers were *not* allowed to leave the compound without supervison.  *See, e.g.*, Rec. Doc. 333-1 at ¶¶ 6-8 (Declaration of Malagapo and the Exhibits attached thereto; *see also, e.g.,* Rec. Doc. 312-3 at pp. 23-27 (Declaration of

---

[6] Defendants provided no declarations denying the allegations, just photos of Happy Filipinos.

5

558907v.1

Malagapo in Support of Motion to Modify Protective Order and Impose Sanctions and the Exhibits attached thereto).

C. **D&R admits it, fired employees for visiting the police during their "free time," denied employees their documents, and kept a blacklist.**

1. *Malagapo detailed how Plaintiffs were not free to leave and visit locations of their choosing, and that they would be fired if they failed to disclose where they went in their "free time."*

Defendants D&R, Malagapo, and Dayao argue that the termination of Francisco Villanueva was justified because he lied about visiting the Police, but that very argument shows that Defendants restricted when and how Plaintiffs could travel outside the compound, and the places they could visit in their "free time." It is undisputed that Francisco Villanueva was fired for refusing to tell DNR and GIS employees that he went to the police station to obtain *his* police clearance in his spare time. Rec. Doc. 333-1 at ¶¶ 9-29.

The declaration of Malagapo illustrates two important points: (1) Notably absent from Malagapo's declaration is any assertion that the Plaintiffs were able to come and go as they pleased; (2) Plaintiffs were punished for leaving the compound unescorted in their "free time," and fired for refusing to tell Defendants where they had been in their "free time." *See generally, id.* Notably, when a group of Filipino Workers left the compound without an escort to retrieve their police clearances, they were picked up by D&R and GIS employees, interrogated, and Villanueva was fired for refusing to tell Malagapo and Dennis Collins (a GIS employee) where he had been. *Id.* at ¶¶ 9-27.

Malagapo provided a detailed and disturbing account of the incident which shows the control Defendants exerted over the Plaintiffs' movements. *Id.* at ¶¶ 9-27. After receiving word from a GIS employee that Filipinos were seen unescorted outside of the compound, Malagapo stated that he and Dennis Collins went to "pick up four Filipinos that were seen walking down

6

the road."[7] After finding the men on the road, Malagapo asked the men where they were coming from.[8] Malagapo asked "what they were trying to do at the police station", and the workers responded that they were not trying to find the police.[9] Malagapo continued to press them, asking "again what they intended to do if they found the police station."[10] When one worker broke and said that they were going to ask for police clearances, Malagapo asked if they received the clearances and the workers replied they had not.[11] Collins informed them that if they needed a ride, "we [Grand Isle] would arrange transportation for them."[12] Once they returned to the bunkhouse, Malagapo sent three of the men inside, leaving Mr. Villanueva alone in the truck with Malagapo and Collins so they could continue their questioning.[13] Villanueva denied obtaining a clearance. Malagapo then confronted another of the men inside the bunkhouse who admitted that they had gone to the police station and received their clearances. Upon "realizing that Mr. Villanueva had lied," Malagapo ordered that he be fired.[14] According to Dalire, he was taken aside and terminated.[15]

Malagapo's Declaration raises more questions than it answers. If Plaintiffs are free to leave the compound, why did Malagapo and Dennis Collins interrogate the Plaintiffs about where they had been? Why can't the Plaintiffs go to the Police without a "company man" being present?[16] Why were the workers afraid to tell Malagapo and Collins where they had been? Why were they afraid to admit that they obtained security papers from the Police? Why is a

---

[7] ¶ 11; see also Declaration of Fancisco Villanueva, 321-6, ¶ 5-6.
[8] ¶ 12
[9] ¶ 14
[10] ¶ 15
[11] ¶ 16.
[12] ¶ 18
[13] ¶¶ 17-18.
[14] ¶ 25
[15] 321-5, ¶¶ 8-12.
[16] "Mr. Collins explained that if they needed a ride somewhere, just let us know and we sould arrange transportation…"

7

worker required to report whether he obtained a police clearance and risk being fired if he keeps his affairs confidential?[17] Why did Malagapo and Collins repeatedly interrogate workers about why they were going to the police?[18]

Defendants D&R, Dayao, and Malagapo admit Villanueva was fired for *lying about obtaining a police clearance when he was off the clock.* There is nothing "free" about free time on the GIS compound. Instead, Malagapo's own declarations prove that workers were punished for leaving the compound, punished for obtaining declarations, and punished for refusing to tell the Defendants where they had gone in their "free" time.[19]

### 2. *Malagapo admitted that he did not provide certifications.*

Malagapo stated "Providing certifications of employment to workers was causing D&R Resources difficulty in fulfilling their manpower requirements."[20] According to Malagapo, he and Dayao told Filipino workers – "a few years ago" – that they would not provide certifications to workers who were willing and planning to come back after their vacation.[21]

Workers are entitled to their certifications and may seek *subsequent* employment while still fulfilling their current employment contracts with DNR, D&R, and GIS. The D&R policy effectively forced employees to make one of two decisions to receive their certification: 1) commit to returning to D&R and GIS and not receive a certification, thereby preventing the worker from exploring other job opportunites; 2) resign from D&R and GIS and receive a

---

[17]

[18] "I asked again what they intended to do if they found the police station

[19] While Defendants cite a job evaluation, along with lying about going to get his clearance, as the reasons for firing Villanueva, it is worth noting that Villanueva was disciplined for complaining that "he only gets paid 12 hrs per day." It appears from the record that Villanueva welded twelve hours a day, but was also asked to perform other tasks which pushed his day to fourteen hours, while only being paid for twelve. Rec. Doc. 333-3, p. 2.

[20] ¶ 59

[21] ¶62

certification without any new employment waiting. D&R made it impossible for a worker to explore other job opportunities while working at GIS.

### 3. *The Blacklist.*

Defendant Malagapo admits that he keeps a list of Plaintiffs, just as Dalire testified.[22] He argues, however, that he keeps the list to identify workers he may not talk to about the litigation. Upon closer inspection, Malagapo's assertion proves illogical.

There is no reason to have a list of Plaintiffs to help Malagapo "remember that he was not to talk to any **plaintiffs** about this litigation." Rec. Doc. 333, p. 9 (emphasis added). The Order of the Court in this case is clear – Malagapo and the Defendants are not allowed to talk to *any* "Plaintiff or Opt-in Putative Class Member or potential Putative Class Member" about anything other than "current or prospective employment." Rec. Doc. 119, p. 2.

**It is a violation of the Order for Malagapo to discuss the litigation with *any* potential putative plaintiff – which encompasses *all* of the Filipino Overseas Workers employed at GIS.** Because Defendants are barred from discussing the litigation with all potential plaintiffs, there is no reason to distinguish named Plaintiffs for purposes of identifying with whom the litigation may be discussed. Malagapo's excuse falls flat. Either Malagapo has been regularly violating the Order by discussing the litigation with potential putative plaintiffs, or the list served the purpose claimed by Dalire.

### D. **The credibility of Michael Dalire is proven by the documentary evidence proving Defendants' theft of tax refunds**.

The credibility of Michael Dalire is proven by the attached declarations of Ferdinand Garcia and Adrian Payagan. *See* Exhibits "1" and "2." Each of these declarations prove that Mr.

---

[22] Rec. Doc. 321-5, ¶¶5-7.

9

Dalire testified truthfully about the theft of tax returns and forging of powers attorney, as well as the other subjects in his declaration.

According to the Declaration of Ferdinand Garcia, his signature on a power of attorney, which purports to assign and transfer any and all tax refunds to D&R, is forged.  *See* Exhibit 1 at ¶¶ 2-4.  The power of attorney was supposedly executed on July 9, 2008 before a Notary Public and two witnesses (employees of D&R and/or GIS) in Louisiana.  *See* Exhibit "A" (attached to Declaration of Ferdinand Garcia).  Garcia could not have signed that document because, as his passport proves, he arrived in the Philippines on July 5, 2008 and did not return to the United States until August 3, 2008.  *See* Exhibit 1 at ¶¶ 2-4; *see also* Exhibit "B" (attached thereto) (photos of Mr. Garcia's passport with stamps proving his arrival in the Philippines on July 5, 2008 and his arrival back to the United States on August 3, 2008).

Adrian Payagan also denies signing a power of attorney on July 9, 2008, before the same Notary and witnesses, in Louisiana.  *See* Exhibit "2" at ¶¶ 2-6. Payagan was in the Philippines from June 21, 2008 –August 3, 2008.  *Id.* at ¶ 4; *see also*, Exhibit "B" (attached thereto).  In addition to the power of attorney, Payagan's signature was forged on additional documents, including an IRS Form 2848, executed July 1, 2008, and a Louisiana Department of Revenue Power of Attorney and Declaration of Representative executed July 1, 2008.  *See* Exhibit "2" at ¶¶ 2-6; *see also* Exhibits "C" and "D" (attached thereto).

## CONCLUSION

For the reasons set forth herein and in Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Contempt and Sanctions, (Rec. Doc. 321-2), the remedies as enumerated in Plaintiffs' motion and memorandum are justified and are tailored to remedy Defendants' violations.  Rec. Docs. 321; 321-2 at pp. 19-20.

Respectfully submitted,

  /s/ Joseph C. Peiffer
Joseph C. Peiffer (LA Bar No. 26459)
Loretta G. Mince (LA Bar No. 25796)
Alysson L. Mills (LA Bar No. 32904)
Jeanette A. Donnelly (LA Bar No. 33806)
FISHMAN HAYGOOD PHELPS
WALMSLEY WILLIS & SWANSON, L.L.P.
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
jpeiffer@fishmanhaygood.com
lmince@fishmanhaygood.com
amills@fishmanhaygood.com
jdonnelly@fishmanhaygood.com

Todd M. Schneider (*pro hac vice*)
Carolyn H. Cottrell (*pro hac vice*)
Peter B. Schneider (*pro hac vice*)
Lee B. Szor (*pro hac vice*)
SCHNEIDER WALLACE
COTTRELL BRAYTON KONECKY LLP
180 Montgomery Street, Suite 2000
San Francisco, California 94104
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
ccottrell@schneiderwallace.com
pschneider@schneiderwallace.com
lszor@schneiderwallace.com

Ellaine A. Carr (*pro hac vice*)
ELLAINE CARR & ASSOCIATES, PLLC
P.O. Box 3655
Gulfport, Mississippi 39505
Telephone: (228) 374-2344
Facsimile:  (866) 929-9201
ecarr@ellaineecarrlaw.com

*Attorneys for Plaintiffs*

558907v.1

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants in this case.

/s/ Joseph C. Peiffer
Joseph C. Peiffer
FISHMAN HAYGOOD PHELPS
WALMSLEY WILLIS & SWANSON, L.L.P.
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Telephone: (504) 586-5252
Facsimile: (504) 586-5250

*Attorney for Plaintiffs*