UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ISIDRO BARICUATRO, ET AL                          CIVIL ACTION

VERSUS                                            NO.  11-2777

INDUSTRIAL PERSONNEL AND                          SECTION "N"  (2)
MANAGEMENT SERVICES, INC., ET AL


<u>**ORDER AND REASONS**</u>

    Before the Court are Plaintiffs' Motion for Class Certification Pursuant to Fed. R. Civ.

P. 23 **(Rec. Doc. 401)** and Plaintiffs' Motion for Separate Trials of Claims and Issues Pursuant to

FRCP 42(b) **(Rec. Doc. 400)**.   Defendants' opposition memoranda are filed at Rec. Docs. 468,

469, 471, 473, 480, 481, and 482.   Plaintiffs' reply memoranda are at Rec. Docs. 516 and 517.

Defendants' sur-reply memorandum is at Rec. Doc. 522.

**I. <u>BACKGROUND</u>:**

    The plaintiffs are Filipino workers (including welders and pipe fitters) who allege that

they were fraudulently recruited in the Philippines, given E-2 or B-1/OCS visas, and then

brought to Louisiana, where they were exploited in the oil and gas industry and housed in

deplorable conditions.   They have filed suit against three Louisiana companies (Grand Isle

Shipyard, Inc. ("GIS"); Thunder Enterprises, Inc.; and D&R Resources, LLC) and four

individuals connected to one or more of these companies:   Mark Pregeant; Danilo N. Dayao; Nilfil Peralta; and Randolf Malgapo.   In addition, they have sued four Philippines companies alleged to have recruited and/or obtained visas for certain of the plaintiffs:   DNR Offshore and Crewing Services, Inc. ("DNR"); Pacific Ocean Manning, Inc. ("POMI"); V Manpower Philippines, Inc., f/k/a V People Manpower Philippines, Inc. ("V People"); and Industrial Personnel and Management Services, Inc. ("IPAMS").[1]   *See* Rec. Docs. 1, 24, 172, 235, 311.

The plaintiffs have alleged that the defendants:   (1) subjected them to forced labor in violation of the Trafficking Victims Protection Act of 2003 (18 U.S.C. §§ 1589-90); (2) violated the Racketeer Influenced and Corrupt Organization Act ("RICO") (18 U.S.C. §§ 1961- 68); (3) violated the plaintiffs' civil rights (42 U.S.C. § 1981); (4) violated the Fair Labor Standards Act ("FLSA") (19 U.S.C. §§ 203(m), 206 & 207); (5) violated the Klu Klux Klan Act of 1871 (42 U.S.C. § 1985) and the Thirteenth Amendment; (6) committed the torts of fraud, negligent misrepresentation, false imprisonment, and intentional and negligent infliction of emotional distress under Louisiana law; and (7) breached contracts and/or covenants of good faith and fair dealing.   *See* Rec. Docs. 1, 24, 172, 235, 311.   The plaintiffs also assert these claims on behalf of others similarly situated, as a putative class action under FRCP 23 and a putative collective action under the FLSA.   *See* Rec. Docs. 1, 24, 172, 235.

The Court has conditionally certified the FLSA collective action.   Rec. Docs. 218, 239. The Court has also granted summary judgment dismissing the plaintiffs' false imprisonment

---

[1]  Plaintiffs have recently dismissed their claims against defendants IPAMS and Nilfil Peralta.  *See* Rec. Docs. 543, 544, 545 and 546.

claims.  Rec. Doc. 465.   A motion for summary judgment on plaintiffs' claims pursuant to the

Trafficking Victims Protection Act of 2003 ("TVPA"), 18 U.S.C. § 1589 *et seq*., is pending.

Rec. Doc. 444.

**II.    LAW AND ANALYSIS:**

 Pursuant to Federal Rule of Civil Procedure 23(b)(3), plaintiffs seek certification of two

classes based on claims of breach of contract and the implied covenant of good faith and fair

dealing:   (1) all individuals who signed employment contracts with D&R Resources or V

Offshore, Ltd. to work for Grand Isle Shipyards under E-2 and/or B-1 OCS visas since October

1, 2005; and (2) all individuals who signed employment contracts with Grand Isle Shipyards,

Inc. to work for Grand Isle Shipyards, Inc. under H2-B visas since October 1, 2005.   *See* Rec.

Doc. 401 at 1-2.

In addition, pursuant to Rule 23(b)(2), plaintiffs seek certification of a third class, seeking

declaratory and injunctive relief only for alleged violations of RICO and the TVPA.  This

proposed class would comprise "all individuals who are or will be employed by D&R Resources,

LLC and recruited by DNR Offshore Crewing Services to work for Grand Isle Shipyard, Inc.

under a visa from the Philippines."   Rec. Doc. 401 at 2.

**A.    Applicable Law:**

"The class action is an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only."   *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541,

2550 (2011) (internal quotation marks omitted).   "In order to justify a departure from that rule, a

class representative must be part of the class and possess the same interest and suffer the same

injury as the class members."   *Id.* (internal quotation marks omitted).   "Rule 23(a) ensures that

3

the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate" and its "four requirements — numerosity, commonality, typicality, and adequate representation — effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Id.* (internal quotation marks omitted).

Because of the "important due process concerns of both plaintiffs and defendants inherent in the certification decision," the Supreme Court and Fifth Circuit require district courts to conduct a "rigorous analysis" of the Rule 23 requirements. *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011) (internal quotation marks omitted)  (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)); *M.D. ex rel. Stukenberg v. Perry,* 675 F.3d 832, 837 (5th Cir. 2012)  ("It is well-established that "[a] district court must conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class.") (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996)).   This rigorous analysis requires the Court to look beyond the pleadings, for the "court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Madison*, 637 F.3d at 555 (quoting *Unger v. Amedisys Inc*., 401 F.3d 316, 321 (5th Cir.2005)).   Indeed, it "requires examination of both 'the parties' claims and evidence,' " for the "plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification." *Madison*, 637 F.3d at 555 (quoting *Unger,* 401 F.3d at 321) (internal quotation marks omitted).

The Fifth Circuit has stressed that throughout the certification inquiry, it is the party seeking certification who bears the burden of establishing that *each* Rule 23 requirement is met. *Madison*, 637 F.3d at 554-55; *Berger v. Compaq Computer Corp*., 257 F.3d 475, 481 (5th Cir. 2001) ("the party seeking certification bears the burden of establishing that *all* requirements of

Rule 23(a) have been satisfied") (emphasis in original).   Even in the absence of evidence to the contrary, the Court may not presume that any of the Rule's requirements are met but must hold the party seeking certification to its proof, for the Court owes a duty to ensure that the due process rights of absent putative class members are protected.  *Berger*, 257 F.3d at 481-82.

Under Rule 23, a court may allow one or more members of a class to sue as representative parties on behalf of all members "*only if*:   (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class;  (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and  (4) the representative parties will fairly and adequately protect the interests of the class."   Fed. R. Civ. P. 23(a) (emphasis added).   In addition, plaintiffs must satisfy at least one of the requirements of Rule 23(b).   In this case, the plaintiffs rely on Rule 23(b)(3) to certify their two proposed breach-of-contract classes and on Rule 23(b)(2) to certify their proposed TVPA class.

**B.      Proposed Rule 23(b)(3) Classes Seeking Damages for Breach of Contract:**

Pursuant to Federal Rule of Civil Procedure 23(b)(3), plaintiffs seek certification of two classes based on claims of breach of contract and implied covenant of good faith and fair dealing:

    (1)      All individuals who signed employment contracts with D&R Resources or V Offshore, Ltd. to work for Grand Isle Shipyards under E-2 and/or B-1 OCS visas since October 1, 2005; and

    (2)      All individuals who signed employment contracts with Grand Isle Shipyards, Inc. to work for Grand Isle Shipyards, Inc. under H2-B visas since October 1, 2005.

*See* Rec. Doc. 401 at 1-2.   To certify a class under Rule 23(b)(3), in addition to the four

requirements of Rule 23(a) (*i.e.*, numerosity, commonality, typicality, and adequacy), the

plaintiffs must also demonstrate:   (1) that the questions of law or fact common to the class

predominate over any questions affecting only individual members (referred to as the

"predominance" requirement), and (2) that a class action is superior to other available methods

for fairly and efficiently adjudicating the controversy (known as the "superiority" requirement).

Fed. R. Civ. P. 23(b)(3).

### 1.      Is the Class So Numerous That Joinder of All Members Is Impracticable?

Under Rule 23(a)(1), a class action is proper where "the class is so numerous that joinder

of all members is impracticable."   Fed. R. Civ. P. 23(a)(1).   Although this provision is often

referred to as the "numerosity" requirement, the Fifth Circuit has made clear "that 'the number

of members in a proposed class is not determinative of whether joinder is impracticable.' "  *In re*

*TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013) (quoting *Mullen v. Treasure Chest Casino, LLC*,

186 F.3d 620, 624 (5th Cir.1999)).   Because there is no definite standard as to what number of

class members will satisfy Rule 23(a)(1), the Fifth Circuit has "counseled that 'courts must not

focus on sheer numbers alone.' "  *TWL*, 712 F.3d at 894 (quoting *Pederson v. La. State Univ.*,

213 F.3d 858, 868 n. 11 (5th Cir.2000)).   Instead, in assessing whether Rule 23(a)(1) has been

met, a court must consider all factors bearing on the practicability of joinder, including "the

geographical dispersion of the class, the ease with which class members may be identified, the

nature of the action, and the size of each plaintiff's claim."  *TWL*, 712 F.3d at 894 (internal

quotation marks omitted).

Here, plaintiffs have made virtually no showing regarding the practicality of joinder.  As to the first proposed class (individuals working for GIS with E-2 or B-1/OCS visas under contracts with D&R or V Offshore, Ltd.), plaintiffs submit only the deposition testimony of Mark Pregeant, II, who estimated that the total number of Filipino workers (hired through subcontractors) to work at GIS since 2006 "would have been, I don't know, close to 600 or so, probably.  Like 500."  Rec. Doc. 401-14 at 156-57.   In their reply brief, plaintiffs also point to deposition testimony by Lester Lumba for the proposition that "GIS receives approximately 200 Filipino employees from DNR each year."  Rec. Doc. 517 at 63.  However, in the actual testimony, Mr. Lumba is emphatic that the number is less than 200 because many workers deploy twice or even three times per year, and would be counted multiple times in that number.  Rec. Doc. 401-14 at 379-80.  Moreover, even if the witness had not undermined the reliability of the number, the plaintiffs have provided the Court with no basis for converting the "per year" number into a reliable estimate of class size.  Throughout the litigation, the parties have submitted evidence showing that many of these workers re-enlist repeatedly.  Thus, plaintiffs have provided equivocal "guess-timates" as to class size.

Regarding other factors bearing on the practicability of joinder, the plaintiffs argue (without pointing to any evidentiary support) that "most" of the putative class reside in the Philippines and "many" are working elsewhere on overseas visas.   Rec. Doc. 401-1 at 28 of 51.  They do not address other factors, such as the ease with which class members may be identified, presumably because these factors would weigh against a finding that joinder is impractical.   As former and current employees of the defendants, the putative class members would be easy to identify.

In their reply memorandum, the plaintiffs gloss over numerosity, noting that only two defendants have challenged the plaintiffs' showing in this regard.   However, the burden is on the plaintiffs to show that each requirement is met, and the evidence must be sufficient to support a finding by the Court regardless of whether any defendant submits evidence to the contrary.  *See Berger*, 257 F.3d at 481-82.   Given the plaintiffs' equivocal  evidence regarding class size and utter failure to make a showing regarding other factors bearing on the practicability of joinder, the Court is unable to make a finding that Rule 23(a)(1) is met as to the first class.

The plaintiffs' showing is even weaker regarding the second proposed class (individuals working for GIS under H2-B visas).  Although the number of persons in the class is more firm and reliable,[2] it is a small number.  *See TWL*, 712 F.3d at 895 (noting that even "[o]utside the bankruptcy context, a putative class with only 130 members already might present a close question as to numerosity, depending on the particular circumstances of the case").  Only 48 individuals meet the class definition.   Especially given the plaintiffs' failure to make a showing regarding the other factors bearing on the practicability of joinder and given that these 48 workers are easily identifiable,[3] the Court finds that the second proposed class fails to satisfy the requirements of Rule 23(a)(1).

---

[2]  Mark Pregeant testified that GIS hired H2-B workers in only one year (2008), and that they hired 48 such workers.  Rec. Doc. 401-14 at 137.

[3]  As with the first proposed class, plaintiffs offer no evidence regarding other factors bearing on the practicability of joinder.  *See* discussion *supra*.  They argue that "most" of the putative class reside in the Philippines and "many" are working elsewhere on overseas visas, but they do not attempt to state how many are dispersed outside the Philippines and point to no evidence in this regard.  *See* Rec. Doc. 401-1 at 18.

**2.    Are There Questions of Law or Fact Common to the Class?**

A class may be certified under Rule 23 only if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  As the Supreme Court has observed, the language of Rule 23(a)(2) "is easy to misread," because "[a]ny competently crafted class complaint literally raises common 'questions.' "  *Dukes*, 131 S. Ct. at 2551 (internal quotation marks omitted).  Yet many so-called "common" questions are such that they would give a court "no cause to believe" that all class member's claims could be "productively be litigated at once." *Id.*  "What matters to class certification ... is not the raising of common 'questions' — even in droves — but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Id.* (citation omitted).  Rule 23(a)(2) requires a specific kind of commonality:   Each class member's claim "must depend upon a common contention" and this "common contention, moreover, must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims *in one stroke*."  *Id.* (emphasis added); *Stuckenberg*, 675 F.3d at 840-41.

Plaintiffs argues that the breach-of-contract proposed classes satisfy the commonality requirement of Rule 23(a)(2) because they present the following questions, which plaintiffs maintain are common to the class:   (1) Whether the class members all signed form employment contracts, and whether under applicable Louisiana law those contracts incorporate the protections of the FLSA; (2) Whether GIS, D&R, and V Offshore are or were joint employers; (3) Whether GIS's policy and practice of not paying the employees for their pre-shift waiting

9

and preparation time fails to pay the workers for all hours worked in violation of their contracts;

(4) Whether GIS's policy and practice of not paying for post-shift doffing and clean up time fails

to pay the workers for all hours worked in violation of their contracts; (5) Whether GIS's policy

and practice of not paying the Filipino workers for their travel time fails to pay the workers for

all hours worked in violation of their contracts; (6) Whether GIS has failed to adopt a policy

against off-the-clock work or implement adequate procedures to ensure that the Filipino workers

are paid for all hours worked; (7) Whether GIS, D&R, and V Offshore breached the covenant of

good faith by violating the class members' contracts with a dishonest or morally questionable

motive.[4]

      To recover for breach of contract, a plaintiff must establish the following essential

elements:   (1) that the obligor undertook an obligation to perform; (2) that the obligor failed to

perform the obligation, and (3) that such failure to perform resulted in damages to the obligee.

*See Favrot v. Favrot*, 68 So. 2d 1099, 1108-09 (La. Ct. App. 4th Cir.), *writ denied*, 62 So.3d 127

(La. 2011).   Most of the plaintiffs' proffered common questions fail the test for commonality

under *Dukes.*   First, nearly all of the questions present inquiries that are on their faces

individualized, such that they could not possibly generate a common answer "in one stroke."

For example, answering the plaintiffs' first "common" question (whether each class member

signed a form employment contract) obviously entails multiple individualized inquiries, an

examination of the contract(s) signed by each class member, and an answer on behalf of each.

---

[4]  As a threshold matter, defendants argue that plaintiffs' common "breach-of-contract"
issues are actually disguised FLSA claims, which cannot be certified under Rule 23, but rather,
are limited to procedures for collective actions provided in the FLSA.  *See, e.g.,* Rec. Doc. 473 at
13-14.  The Court will address this argument in connection with the superiority requirement
*infra*.

Likewise, the common answers produced by questions 3, 4, 5 and 6 are relevant only in the theoretical realm.  The existence *vel non* of a GIS practice or policy is pertinent to the validity of a particular class member's breach-of-contract claim only to the extent it is shown to have resulted in a failure to perform an obligation owed to that class member.   Thus, for each member's breach-of-contract claim the determinative question is whether the relevant defendants failed to pay him for work performed as agreed upon in the parties' contract.  This necessarily entails an individualized inquiry into the terms of each class member's contract(s) and the particular circumstances of his employment.  As the defendants have shown, these contracts and circumstances vary greatly among the putative class members.  Some class members work under land-based contracts, others under seafarers' contracts, the terms of which are quite different.  Some positions require the use of protective clothing; others do not.  Some workers have to travel considerable distances to their job sites, others do not.  Some are paid for travel; others are not.  Some are paid for a set number of hours even if they work fewer hours.  *See* Rec. Docs. 473 at 13-21 and 522 at 5-11 and materials cited therein.  Thus a "yes" or "no" answer to questions 3, 4, 5 and 6 will not "resolve an issue that is central to the validity of *each one* of the claims in one stroke."  *Dukes*, 131 S. Ct. at 2551 (emphasis added).   Regardless of the answer, the individual circumstances of each class member's employment must be examined to determine whether the defendants failed to perform an obligation owed to a particular class member.

Nevertheless, although most of plaintiffs' proffered questions fail to pass muster under *Dukes*, the Court finds that the commonality requirement has been met, for the plaintiffs have articulated at least one issue (a purely legal one) which has the potential to determine the validity of each class member's breach-of-contract claim in one stroke:  *i.e.,* whether the employment

contracts entered into by the class members incorporate the protections of the FLSA by operation of law.   Because nearly all of plaintiffs' breach-of-contract claims rest upon FLSA requirements rather than express provisions of contract, it appears to the Court that a negative answer to this question would dispose of all class members' claims in one stroke, or at least certain aspects of all class members' claims.   Granted, a positive answer to the question would lead the Court into a morass of individualized inquiries, as discussed above.   However, "the existence of even one common question ... satisfies Rule 23(a)(2)."   *Ahmad v. Old Republic Nat. Title Ins. Co.*, 690 F.3d 698, 704 (5th Cir. 2012).

The Court recognizes that the plaintiffs have made arguments in their reply brief which would appear to vitiate the relevance of whether FLSA terms are incorporated by law into class members' contracts.   *See* discussion *infra* at 25-26.   However, the Court need not waste time parsing the question of whether plaintiffs have articulated even one common question, for the truly determinative inquiry in this regard is whether the proposed class satisfies the predominance requirement of Rule 23(b)(3).   Indeed, in the Rule 23(b)(3) context, the commonality requirement is said to be "subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions."   *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 609 (1997); *see also Ahmad,* 690 F.3d at 702-04.   Thus, it is appropriate for the Court to pretermit the commonality issue and "train[] its attention on the 'predominance' inquiry."   *Amchem*, 521 U.S. at 609 (citing *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d Cir.1996)).

### 3.    Are the Claims of the Class Representatives Typical of the Claims of the Class?

Rule 23(a)(3) requires a finding that the claims of the class representatives "are typical of the claims...of the class."   Fed. R. Civ. P. 23(a)(3).   In this inquiry, the "focus is on the general similarity of the named plaintiffs' legal and remedial theories and the legal and remedial theories of those whom they purport to represent."   *In re Ford Motor Co. Bronco II Product Liability Litigation*, 177 F.R.D. 360, 366-67 (E.D. La. 1997) (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986)); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (Typicality "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent."), *cert. denied*, 528 U.S. 1159 (2000).   A class representative's "claim is 'typical' if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Bronco II*, 177 F.R.D. at 366 (citing 1 HERBERT B. NEWBERG, ET AL, NEWBERG ON CLASS ACTIONS § 3–13 at 3–76 (3d ed. 1992)).   "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of varying fact patterns which underlie individual claims."   *In re Chinese-Manufactured Drywall Products Liability Litigation,* Slip Copy, 2013 WL 499474 *8 (E.D. La. 2013) (quoting RUBINSTEIN, 1 NEWBERG ON CLASS ACTIONS § 3:13) (internal quotation marks omitted).

Plaintiffs argue that the claims of the proposed class representatives[5] are typical of the claims of the class "because they all arise out of GIS' policies and procedures regarding

---

[5]   Plaintiffs seek to appoint Isidro Baricuatro and Rufino Orlanes as class representatives of the E-2/B-1 OCS visa-holder class and Ricardo Ramos as class representative of the H2-B visa-holder class.

13

compensating the employees, and Defendants' failure to pay the employees for all hours worked." Rec. Doc. 401-1 at 39. Defendants point to the many factual differences in the employments of the proposed class representatives and argue that these preclude a finding that typicality is met. *See* Rec. Docs. 472 at 27-30, 522 at 11. However, the test for typicality "focuses less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of the legal and remedial theories behind their claims." *Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 472 (5th Cir. 1986). The legal and remedial theories relied upon by the proposed class representatives are identical to those of all putative class members. Thus, the Court finds the typicality requirement to be met. The many factual differences illustrated by the defendants are better addressed in connection with the predominance and superiority inquiries discussed *infra.*

**4.      Will the Class Representatives Fairly and Adequately Protect the Interests of the Class?**

Rule 23(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement "encompasses class representatives, their counsel, and the relationship between the two." *Berger,* 257 F.3d at 479. It "mandates an inquiry into [1] the zeal and competence of the representative[s'] counsel and ... [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees[.]" *Id.* (quoting *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir.1982)) (internal quotation marks omitted). To be found "willing" and "able" to protect the interests of the class, the

14

proposed class representatives must "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Id.* at 482-83.[6]

The adequacy inquiry also " 'serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent.' " *Id.* at 479-80 (quoting *Amchem*, 521 U.S. at 625). Throughout the inquiry, the Court must remain cognizant of "the constitutional dimensions of the adequacy requirement." *Id.* at 481. "[B]ecause absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times." *Id.* at 480. "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only where those differences create conflicts between the named plaintiffs' and the class members' interests." *Id.*

The defendants argue that the plaintiffs have failed to establish the adequacy requirement because they have presented no evidence demonstrating the adequacy of the putative class representatives. Defendants also suggest that certain facts attendant to the class representatives' claims[7] create a conflict between the proposed class representatives and the putative class

---

[6] Although the *Berger* court noted that the Private Securities Litigation Reform Act of 1995 ("PSLRA") "raises the standard adequacy threshold," 257 F.3d at 483, the requirements discussed herein (*e.g.*, that class representatives "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation") are part of the "long-established" generic standard of establishing adequacy under Rule 23(a)(4), and are not derived from the PSLRA. *See Feder v. Electronic Data Systems Corp.*, 429 F.3d 125, 129-30 (5th Cir. 2005) (quoting *Berger v. Compaq Computer Corp.*, 279 F.3d 313, 313–14 (5th Cir.2002)).

[7] For example, defendants point out that: (1) Isidro Baricuatro had testified in his deposition that defendants did not breach his employment contracts; (2) Ricardo Ramos has released his claims by executing a quitclaim deed of release; and (3) Rufino Orlanes and Ricardo

members which precludes a finding of adequacy.  The Court need not decide whether the differences between the proposed class representatives and class members are sufficient to create a conflict of interest, for the plaintiffs have pointed the Court to no evidence whatsoever that any of the three proposed class representatives "possess a sufficient level of knowledge and understanding" to take an active role in controlling the litigation and prosecuting it in a manner that will protect the interests of all class members.  *Berger*, 257 F.3d at 482-83.  Thus, they have failed to carry their burden of demonstrating that Rule 23(a)(4) is satisfied.

5.    **Do Questions Common to the Class Predominate Over Questions Affecting Only Individual Members?**

A class may be certified under Rule 23(b)(3) only if "the court finds that the questions of law and fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).   This is known as the predominance inquiry.

Although the existence of even one common question satisfies the commonality requirement of Rule 23(a)(2), the predominance inquiry of  Rule 23(b)(3) is "far more demanding."  *Funeral Consumers Alliance, Inc. v. Service Corp. Intern.*, 695 F.3d 330, 348 (5th Cir. 2012).   The predominance inquiry requires courts "to consider how a trial on the merits would be conducted if a class were certified."  *Id.* at 348 (citations and internal quotations omitted).   Thus, it "'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class,' a process that ultimately 'prevents the class from degenerating into a series of individual trials.' "  *Madison,* 637 F.3d at 555 (quoting *O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732, 738 (5th Cir. 2003)); *Ahmad v. Old Republic Nat. Title Ins. Co.,* 690 F.3d 698,

Ramos entered into arbitration agreements.  Rec. Doc. 473 at 32.

702 (5th Cir. 2012). The inquiry must probe beyond the pleadings, for the Court "must understand the claims, defenses, relevant facts, and applicable substantive law." *Madison,* 637 F.3d at 555; *O'Sullivan*, 319 F.3d at 738. Of course, the test for whether an issue is common to the class is that enunciated in *Dukes*, discussed *supra*. *See Ahmad*, 690 F.3d at 702.

The Court finds that the plaintiffs have failed to meet their burden with respect to predominance. First, as discussed above in connection with commonality, nearly all of the common questions proffered by the plaintiffs fail the test for commonality set forth in *Dukes*. They either necessarily entail individualized inquiries and thus do not yield common answers, or they are common only in a theoretical sense, with their answers failing to decide in one stroke any inquiry that is central to liability for breach of contract. *See* discussion *supra* at 10-11. The existence of a GIS practice or policy is central to the validity of a particular class member's breach-of-contract claim only to the extent it resulted in a failure to perform an obligation owed to that class member.

Second, even if the Court were to count all of the plaintiffs' proffered questions as truly common questions (despite their failure to satisfy *Dukes*), they would still be swamped by the overwhelming number of individual factual inquiries inherent in litigating the breach of contract claims. For example, a threshold issue will be whether a valid contract exists between the class member and a defendant. This will entail individualized inquiries, as will the question of determining the terms of a class member's contract. *See* Rec. Docs. 473 at 13-21 and 522 at 5-11 and materials cited therein. Determining failure to perform (*i.e.*, breach) will also necessarily entail consideration of the individual circumstances of the particular class member's employment, including wages and benefits paid, travel time to various work sites, the duration of shifts on various work assignments, and the equipment required for particular work assignments,

just to name a few.  The importance of such questions is not confined to quantification of

damages.  They are central to the determination of liability.  Even if the plaintiffs were content

to rest their liability case after presenting only evidence of the defendants' general practices

(which evidence at this point is thin indeed), it is clear that the defendants intend to ground their

defense against the breach-of- contract claims in the individual circumstances of each class

member's employment.  *See id.*  Thus, the Court finds that the individualized questions raised by

defendants will predominate over the common questions proffered by the plaintiffs, both in

terms of number and more importantly, in the amount of trial and pretrial time and resources

required.[8]

     Third, in addition to these individualized fact questions, the defendants point out several

questions of law that are not common to the class.  For example, the employment contracts of

certain class members expressly call for the application of Philippine law, while others do not.

The employment contracts of some class members requires resolution of disputes by arbitration;

others do not.  Some class members have executed quitclaim deeds purporting to release their

claims against the defendants; others have not.  Such questions have already consumed the vast

majority of the Court's time and efforts, and they will continue to do so regardless of

certification, for the contractual relationships are not uniform across the putative class.  Even if

the terms of the FLSA are imputed by law into all of the contracts (which has not been decided),

---

     [8]  For the same reasons, this holding applies equally to claims for breach of the duty of
good faith and fair dealing, for they rely upon the same disparate circumstances as the breach of
contract claims.  *See Maldonado v. Ochsner,* 237 F.R.D. 145, 154 (E.D. La. 2006), *aff'd,* 493
F.3d 521 (5th Cir. 2007); *In re Katrina Canal Breaches Consolidated Litigation,* 2009 WL
1707923 *7 (E.D. La. 2009).  Even accepting plaintiffs' argument that only the defendants'
conduct and intent is pertinent to these claims, the plaintiffs have brought these claims against
multiple defendants acting through multiple agents, thereby necessitating individualized
analyses.  *Canal Breaches*, 2009 WL 1707923 at *7.

differences among the contracts will remain, will continue to govern the rights between the parties, and will continue to have real legal consequences.   Determining whether a class member has agreed to arbitrate his claims (as the Court has already been required to determine for several named plaintiffs)[9] is a detailed, individualized inquiry that requires close scrutiny of the agreements entered into by that individual.   Determining whether a particular class member has contractually released his claims likewise requires careful, individualized examination.   Such inquiries alone would render the proposed class action unworkable even if they arose only  in a minority of claims.   Therefore, even if all other factors discussed herein favored certification (which they do not), the Court likely would find predominance (and superiority) to be lacking based on this consideration alone.

Fourth, when the issue of damages is brought into the mix, the predominance of individualized issues over common ones is so overwhelming as to be beyond the bounds of reasonable debate.   Indeed, the plaintiffs do not contend otherwise.   Instead, they recite the mantra that individualized issues related to damages should be disregarded in determining predominance and cannot preclude certification.   *See* Rec. Docs. 401-1 at 30-31, 517 at 35. However, while it is true that the need for individualized damage calculations need not always preclude certification,[10] neither is it an impermissible consideration.   Indeed, the Fifth Circuit has repeatedly found 23(b)(3) certification precluded where, as here, individualized issues related to damages predominate over class-wide issues.   *See, e.g., O'Sullivan,* 319 F.3d at 744-45 (district

---

[9]  *See* Rec. Docs. 330, 440 and 447.

[10]  *See Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir.2001) (affirming certification where "calculating damages w[ould] require some individualized determinations" but "virtually every issue prior to damages [wa]s a common issue" and "not all of the relief require[d] individualized determination.").

19

court abused its discretion in certifying class "[i]n light of the individual calculation of damages that is required"); *Ditcharo v. United Parcel Serv., Inc.*, 376 Fed. Appx. 432, 438-39 (5th Cir. 2010); *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602-03 (5th Cir. 2006).   Thus, while the Court has found individual issues in this case to predominate even without considering damages, the overwhelming burden of adjudicating hundreds of individual damages claims[11] is yet one more reason why the proposed classes cannot succeed.

### 6.      Is a Class Action Superior to Other Available Methods for Fairly and Efficiently Adjudicating the Controversy?

Certification under Rule 23(b)(3) is appropriate only if it is established "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Factors relevant to this finding include:  "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  *Id.*

These factors are "not meant to be exhaustive and the court has discretion to consider whatever other factors it deems relevant to the determination."  *TWL*, 712 F.3d at 895 (quoting

---

[11]  Although plaintiffs have moved to bifurcate the trial of damages, they have not made any showing as to how these issues would be tried, much less presented a manageable trial plan. *See* Rec. Doc. 400-1 at 12-13.  Instead, they gloss over this critical issue with a few blithe platitudes and assurances that the Court "will have substantial discretion and flexibility in crafting the procedures for adjudicating Phase II damages" and "need not decide at this juncture precisely how it will handle the damages Phase."  *Id.*  Such a "figure-it-out-as-we-go-along" approach will not suffice, *Madison*, 637 F.3d at 557, and is in stark contrast to the detailed trial plans and use of subclasses that have been found in some cases to overcome the problem of individualized damages.  *See Watson v. Shell Oil Co.*, 979 F.2d 1014, 1017-18 (5th Cir. 1992).

CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1777 (3d ed. 2005)); *see also* Fed. R. Civ. P. 23(b)(3), advisory comm. note to 1966 amendment ("Factors (A)–(D) are listed, *non-exhaustively*, as pertinent to the [predominance and superiority] findings.") (emphasis added).   As the Fifth Circuit has observed, the superiority requirement "necessarily suggests a comparative process." *TWL*, 712 F.3d at 896.   "This plain reading of the Rule is reinforced by an associated advisory committee's note, which states that the court 'ought to assess the relative advantages of alternative procedures for handling the total controversy.' " *Id.* (quoting Fed. R. Civ. P. 23(b)(3) advisory comm. note to 1966 amendment).

Even if the proposed 23(b)(3) classes met every other requirement, they would nonetheless fail, for they founder fatally on the superiority requirement.   First, the likely difficulties of managing the proposed class litigation weigh heavily against certification.   Fed. R. Civ. P. 23(b)(3)(D).   A few of the likely difficulties have already been discussed *supra* in connection with the predominance inquiry.   The factual and legal issues requiring individual determination are numerous, and the plaintiffs have proffered no serious plan for rendering their adjudication manageable.   Compounding these manageability problems is the fact that a majority of putative class members reside in the Philippines, with others allegedly "dispersed around the globe on overseas work visas."   Rec. Doc. 401-1 at 28.   The plaintiffs do not meaningfully address any of the difficulties inherent in managing these challenges, much less offer a thoughtful, real-world plan for mitigating the problems.

Second, there are significant factors that weigh against the desirability of concentrating the litigation of the claims in this particular forum.   Fed. R. Civ. P. 23(b)(3)(C).   As the Fifth Circuit has explained, the superiority requirement "necessarily suggests a comparative process"

and "the court 'ought to assess the relative advantages of alternative procedures for handling the total controversy.' " *TWL*, 712 F.3d at 896 (quoting Fed. R. Civ. P. 23(b)(3) advisory comm. note to 1966 amendment).   Here, the proposed class purportedly consists of 500 to 600 Filipino workers, most of whom reside in the Philippines.   The defendants also include Filipino individuals and companies based in the Philippines.   Much ink has been spilled already in this litigation regarding the extensive involvement of the Republic of the Philippines government, through the Philippine Overseas Employment Administration ("POEA"), in supervising and regulating the employment of Filipino workers in overseas positions.  *See, e.g.*, Rec. Doc. 330 and documents cited at note 1 therein.  And the parties already have educated the Court regarding the expansive authority of the Philippine National Labor Relations Commission (NLRC") (the Philippine labor court) to adjudicate any and all money claims arising out of any law or contract involving Filipino workers in overseas employment.  *Cf. Lim v. Offshore Specialty Fabricators, Inc.,* 404 F.3d 898, 908 (5th Cir. 2005) (citing Migrant Workers and Overseas Filipino Act of 1995, Republic Act 8042, § 10 (2004), available at http://www.poea.gov.ph/rules/ra8042.html) ("There is no reason to conclude the NLRC could not consider an action arising under the FLSA, *if* that statute applies to plaintiffs' claims.").  Thus, in an analysis that requires a comparison of alternative means of adjudication, the question necessarily arises whether a Rule 23 class action in this forum is superior to the procedures established for adjudicating workers' claims in the Philippines.  Yet, the plaintiffs do not even address it.

     The defendants do raise it and point out the attendant concerns of international comity, as well as logistical problems that have already occurred due to denial of visas for travel to this

forum.  *See* Rec. Doc. 469 at 11-12 and n.5.   Plaintiffs' response to this argument is that

"Defendants proffer no evidence to support this contention" and that since class members

"typically" return to work at GIS for multiple contracts, "there is little reason to believe that a

class action proceeding in this forum would be inconvenient to them."  Rec. Doc. 517 at 50 of

72.  This response fails to withstand even the most superficial scrutiny.[12]   Moreover, it turns the

Rule 23 burden on its head.   The party seeking certification bears the burden of establishing that

*each* of Rule 23 requirements is met.  *Madison*, 637 F.3d at 554-55; *Berger*, 257 F.3d at 481-82.

It is the plaintiffs' burden to show that a class action in this forum is superior to alternative

procedures; not the defendants' burden to demonstrate the contrary.

  Finally, to the extent that the claims of the proposed classes rely upon the FLSA, a Rule

23(b)(3) class cannot as a matter of law constitute a superior means of fairly and efficiently

adjudicating such claims, for Congress has expressly mandated that representative actions

asserting claims for minimum wage and unpaid overtime proceed by the "opt-in" procedure

provided in 29 U.S.C. § 216(b).   Thus, there is a "fundamental, irreconcilable difference"

between Rule 23 class actions and the collection actions provided for by the FLSA:  the FLSA

class member are bound by the court's judgment only if they "opt in," whereas Rule 23(b)(3)

class members are bound by any class judgment unless they have timely "opted out."

*LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 289 (5th Cir. 1975); *compare* 29 U.S.C. §

216(b) ("An action to recover the liability prescribed in either of the preceding sentences may be

---

  [12]  Even assuming that 200 Filipino workers were deployed to GIS at one time, that would still leave 300 to 400 putative class members in the Philippines or "dispersed around the globe."  Rec. Doc. 401-1 at 28 of 51.   It would seem obvious that this forum would be very inconvenient to them; yet plaintiffs make no showing at all to address this concern.

maintained...by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."), *with* Fed. R. Civ. P. 23(c)(2)(B)(v) (notice to class members must clearly state "that the court will exclude from the class any member who requests exclusion").  The Fifth Circuit has been very clear:  "Rule 23 cannot be invoked to circumvent the consent requirement of the ... FLSA."  *LaChapelle,* 513 F.2d at 289.

Based upon the plaintiffs' original motion papers, it appeared quite clear that the claims of the proposed 23(b)(3) classes were directly dependent upon the provisions of the FLSA, which plaintiffs' argued, were incorporated by operation of law into each of the plaintiffs' employment contracts.  *See* Rec. Doc. 401-1 at 20-27.  Indeed, the showing made by the plaintiffs on the commonality requirement rested almost entirely on the FLSA and its jurisprudence.  As defendants pointed out in their opposition memorandum, in describing the "common" contractual issues presented by the proposed 23(b)(3) classes, the plaintiffs did not allege that the defendants had breached any specific terms of any employment contract.  Rec. Doc. 473 at 14.  Rather, the plaintiffs' claims rested on assertions that the defendants had breached the employment contracts by violating the FLSA.  *Id.*  The backbone of plaintiffs' commonality argument is as follows:

> Under Louisiana state contract law, one of the material terms inherent in all the contracts at issue here is the protections of **the Fair Labor Standards Act ("FLSA")**.  Indeed, it is well-settled that all employment contractual relationships in Louisiana incorporate the **FLSA protections** as though written into the contract itself.... *See, e.g., Johnson v. Anderson-Dunham Concrete Co.*, 212 La. 276, 282, 31

24

So.2d 797, 799 (1947) ("When such an agreement [between the employer and the employee] (the principal basis for the obligation) exists or comes into being the Federal Wage and Hour Law becomes a part of it, just as if its provisions are specifically included therein by the parties....).... Thus, the protections of the **FLSA** are material terms of every single employment contract in this case without exception.  Class certification is particularly appropriate here because whether GIS's policies and practices have resulted in a breach of the material terms of its form employment contracts—including the **FLSA** protections—is a common question that can generate common answers regarding Defendants' liability to the class as a whole.

*   *   *   *

GIS's admitted policy and practice of not paying any of the employees for their pre-shift preparation time are the same across the class and raise important common questions that are capable of common answers.   Under applicable **FLSA** precedents, which are incorporated into Louisiana law as shown in Section III(B)(1) above, an employer is obligated to pay its employees for all hours worked. ...  This uniform policy and practice raises important common questions as to whether pre-shift preparation time constitute "work" hours **within the meaning of the FLSA** that should be recorded and paid by the employer.

*   *   *   *

Under applicable substantive law, GIS's uniform policy and practice of not paying the workers for doffing and clean up time after the conclusion of their shifts raises important common questions that can give rise to common answers.  With respect to post-shift doffing and tool cleaning time, common questions are raised as to whether this time is **compensable under the FLSA** and, by extension, the employees' contracts under Louisiana law.

*   *   *   *

GIS uniformly fails to pay the workers for the time they are required to travel while wearing their protective equipment on company vehicles between the bunkers and the worksites. *See* discussion at II(H), *supra*. Under applicable law, whether travel time is compensable turns on factors including, but not limited to, if the travel is mandated by the employer, if the travel takes place in company vehicles, if the employees are unable to use the time spent in the employer's vehicles for other purposes, if the employees are required to transfer their work tools in the vehicles to and from the worksites, and whether the travel takes place between worksites under the employer's control. *See, e.g.*, *Vega v. Gasper*, 36 F.3d 417, 424-25 (5th Cir. 1994) **[an FLSA case]**.

*   *   *   *

**Under the FLSA**, an employer must pay for any work that it "suffers" or "permits" an employee to perform, not just work that it "requires" or "instructs" its employees to perform. ....  An employer **violates the FLSA** if it has, or should have, knowledge that off-the-clock work is being performed by its employees, and it fails to ensure that its employees are accurately paid for that off-the-clock work.  As discussed, the **FLSA's legal standards** are incorporated into the terms of the employees' contracts.

*   *   *   *

25

> **Under the FLSA**, this time is compensable if the employer permits it, regardless of whether the employees are willing to do it.  Whether Defendants have a policy and practice of permitting such work to happen regularly without compensation can be shown by common proof.  Moreover, **under the FLSA**, Defendants have an affirmative obligation to accurately capture all the work time and pay the employees for it in full.

Rec. Doc. 401-1 at 30-36 of 51 (emphasis added).

In their opposition memoranda, defendants argue that a section 216(b) collective action provides the exclusive avenue for representative actions on claims for violation of the FLSA and argue that it is impermissible to use Rule 23 to circumvent the express requirements for collective actions.  *See, e.g.,* Rec. Doc. 473 at 13-17 of 53 (citing *LaChapelle*, 513 F.2d at 289). In response, plaintiffs make a dramatic about-face in their reply brief.   Despite the lengthy discussion in their original memorandum excerpted *supra* (explaining that the contract claims present common class-wide questions because each class members contracts incorporate the terms of the FLSA and practices in violation of such terms present questions common to the class), plaintiffs chastize the defendants for "misstating" their contract claims as being dependant on the FLSA.  Rec. Doc. 517 at 20 of 72.  In sharp contrast to the FLSA-based description asserted in their original motion papers, the plaintiffs in their reply memorandum explain that their contract claims (the basis of the proposed Rule 23(b)(3) classes) seek strictly to recover "straight time," a right not provided by the FLSA; whereas their FLSA claims (not included in the Rule 23 classes) are for minimum wage and overtime only.  *Id.*   Thus, defendants' characterization of the proposed class claims as duplicative of the claims asserted in the collective action is, plaintiffs argue, misplaced.   In addition, plaintiffs further argue that their claims should fall outside the FLSA's mandatory procedures for representative actions to the

26

extent that they are time-barred under the FLSA.  *See* Rec. Doc. 517 at 22, 48 of 72 ("In addition, many of the class member's claims for off-the-clock overtime work are untimely under the FLSA, and only a breach of contract action with Louisiana's longer statute of limitations will permit those class members any recovery.").

Clearly, the mere co-existence of an FLSA collective action does not preclude the assertion of wholly distinct state-law claims under Rule 23.  29 U.S.C. § 218.  Thus, to the extent that the proposed classes seek to enforce rights not provided for in the FLSA (*e.g.*, claims for straight time under the terms of their contracts), the already-certified FLSA collective action would not be superior, as it does not include such claims.  Consequently, as to such claims, the proposed classes would not fail to meet the superiority requirement on this basis (although they nonetheless fail to meet this requirement for the other reasons stated herein).[13]   However, to the extent that they seek to recover for conduct made unlawful by the FLSA — *i.e.*, failure to pay minimum wage and overtime — the Court finds that the section 216(b) "opt-in" class provides the exclusive and *per se* superior class vehicle when compared to a Rule 23(b)(3) class action.[14]

_____

[13]  Indeed, because its claims would rest strictly on the terms of individual contracts and not on the FLSA, a class pursuing only straight time claims would be even weaker on the predominance issue than the discussion above reflects and would likely fail even to satisfy commonality.  *See* discussion in defendants' sur-reply, Rec. Doc. 522 at 10-11 of 24 ("It is nonsensical for Plaintiffs to argue that the hours and wage provisions of their employment contracts were breached, and at the same time argue that determining these provisions is unnecessary to resolve their contractual [straight time] claims.").

[14]  Even if the Court did not find such claims to be preempted such that § 216(b) provides the exclusive procedure for representative actions on such claims, the Court would still find the collective action to be a superior means of litigating the claims given the progress of the litigation already begun in the FLSA collective action certified by this Court.  *See* Fed. R. Civ. P. 23(b)(3)(B).

*See Karna v. BP Corp. North America, Inc.*, 2013 WL 1155485 *201 (S.D. Tex. 2013) ("common law claims are preempted by the FLSA to the extent the plaintiff seeks damages for unpaid minimum wages or unpaid overtime compensation"); *Newsom v. Carolina Logistics Services, Inc.,* 2012 WL 3886127 *3 (N.D. Miss. 2012)  ("claims...for overtime wages and minimum wages on the basis of quantum meruit are preempted by the FLSA because the right to such wages arises under the FLSA, and that Act affords a remedy for the same;" but claims for straight time work "are not preempted").  To allow the plaintiffs to circumvent the statutory consent (opt-in) requirement solely on the basis that class members' overtime and/or minimum wage claims are time-barred under the FLSA would be indeed repugnant to the FLSA.  *See Karna*, 2013 WL 1155485 at *21 ("the fact that state law causes of action may have more generous statutes of limitations than the FLSA is an argument in favor of, not against, preemption").

Against all of these difficulties and obstacles, the only valid argument offered by plaintiffs in favor of the Rule 23 class vehicle is that the claims are unlikely to be brought if the class is not certified, given that the value of the individual claims is small, that nearly all putative class members live overseas, and that those currently employed might be disinclined to sue their employer.   Although a valid concern that is not taken lightly, this factor is substantially outweighed by the serious and numerous considerations militating against certification of the Rule 23(b)(3) classes, as discussed above.   Therefore, for all of these reasons, the plaintiff's motion will be denied as to the proposed Rule 23(b)(3) classes.

C.      **Proposed Rule 23(b)(2) Class Seeking Declaratory and Injunctive Relief for Alleged Violations of RICO and the TVPA**

Pursuant to Rule 23(b)(2), plaintiffs seek certification of a third class, asserting claims for declaratory and injunctive relief addressing alleged violations of RICO and the TVPA.  This proposed class would comprise:

> All individuals who are or will be employed by D&R Resources, LLC and recruited by DNR Offshore Crewing Services to work for Grand Isle Shipyard, Inc. under a visa from the Philippines.

*See* Rec. Doc. 401 at 2.   The TVPA makes it a crime to knowingly obtain, provide, traffic in, or financially benefit from forced labor — *i.e.*, from labor that is secured by means of force or physical restraint, threats of force or physical restraint, harm or threats of serious harm, abuse or threatened abuse of legal process, or a scheme or plan intended to make a victim believe he or she will suffer serious harm or physical restraint if labor or services are not performed.  *See* 18 U.S.C. §§ 1589 *et seq.*   The Act also provides a limited civil remedy.  18 U.S.C. § 1595.

"Here, ... Plaintiffs' TVPA claims are based exclusively on Defendants' [alleged] pattern and practice of threatening the Filipino work force with deportation."  *See* Rec. Doc. 517 at 69 of 72 (emphasis added).   "Plaintiffs here do not contend that they were forced to stay at GIS and work against their will generally as a result of the threats of deportation.  They claim only that they were compelled by threats of deportation to provide labor that they would not otherwise have provided, including excessive hours beyond that required by their contracts and numerous unpaid work hours."   Rec. Doc. 517 at 70 of 72.  The relief sought by the class is an injunction

"prohibiting Defendants from threatening Filipino workers with deportation as a means of extracting labor from them in excess of their contracts or without compensation." *Id.*

"Rule 23(b)(2) allows class treatment when the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Dukes*, 131 S. Ct. at 2557 (citation and internal quotations omitted); Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* (citation and internal quotations omitted).  "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* "It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.   Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.*; *see also Stukenberg*, 675 F.3d at 845; *Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 198 (5th Cir.2010) (Rule 23(b)(2) "seeks to redress what are really group as opposed to individual injuries.  The uniformity of the injury across the class is what renders the notice and opt-out provisions of (b)(3) unnecessary." ) (citation omitted).

Of course, to be certified under Rule 23(b)(2), a class must first satisfy the requirements of Rule 23(a).   Here, the defendants do not seriously challenge numerosity, and while they assert arguments against commonality and typicality, these arguments are more properly directed to the adequacy inquiry and to questions inherent in Rule 23(b)(2), which are discussed *infra*.

1.     **Do the Class Representatives Have Standing and Will They Fairly and Adequately Protect the Interests of the Class?**

In their motion for class certification, the plaintiffs seek appointment of three individuals as class representatives for members of the proposed Rule 23(b)(2) class:   (1) Samuel Nora; (2) Noel Mallari; and (3) Michael Dalire.  Rec. Docs. 401 at 2, 401-1 at 37.  The defendants have asserted several grounds for questioning whether these men can fairly and adequately protect the interest of other class members:  (1) Dalire is an opt-in plaintiff in the FLSA action, but has not even asserted RICO or TVPA claims; (2) Dalire and Mallari were recently compelled to arbitrate claims against DNR; (3) none of the men meet the class definition, as none is a current employee of any defendant and none has demonstrated a likelihood of being re-hired in the near future; (4) Nora and Mallari have both signed releases; (5) none of the men has personally suffered the threat of injury asserted by the class (*i.e.*, being threatened with deportation and/or forced to work against their will); (6) Nora and Mallari have given deposition testimony demonstrating a serious lack of knowledge and understanding regarding the claims of the class and their duties as class representatives;[15] and (7) Dalire recently contacted GIS and asked to withdraw his claims in this case.

In response, plaintiffs (in a footnote in their reply memorandum) have withdrawn Michael Dalire and Noel Mallari as proposed class representatives.   *See* Rec. Doc. 517 at note 30.  Thus, only Samuel Nora remains.   Pretermitting the question of whether the release signed by Nora is valid, the plaintiffs have failed to demonstrate that Nora "possess[es] a sufficient level of knowledge and understanding" to take an active role in controlling the litigation and

---

[15]  *See* Rec. Docs. 468-7 at 7 of 41, 23 of 41; 468-8 at 5 of 47.

31

prosecuting it in a manner that will protect the interests of all class members.  *Berger*, 257 F.3d at 482-83.  Indeed, his deposition testimony suggests strongly that he understands neither the TVPA claims being asserted by the class nor his role as a class representative.  Rec. Doc. 468-7 at 7 of 41, 23 of 41.  Also troubling is the fact that he signed his declaration without reading it or having it explained to him.  *See* Rec. Doc. 468-7 at 18 of 41.   Moreover, there are serious doubts as to whether he will be able to actively participate in litigating the class action, as he was unable to obtain a visa to travel to the United States even for the purpose of giving a deposition.  *See* Rec. Doc. 468-7 at 6-7 of 41.

Finally, and perhaps most importantly, Nora does not meet the class definition, as he is not a current employee of any defendant and plaintiffs have failed to demonstrate a likelihood that he will be re-hired.  *See* Rec. Doc. 401 at 2 (defining Rule 23(b)(2) class as:  "All individuals who *are* or *will be* employed by [D&R] and recruited by [DNR] to work for [GIS] under a visa from the Philippines.").

This last point has implications not only for Rule 23(a) adequacy, but also for Article III standing.   For Nora to have standing to bring the proposed claims for injunctive relief on behalf of the class, plaintiffs must demonstrate a realistic threat that Nora will again be subjected to the conduct sought to be enjoined.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 107-110 (1983).  They have not done so.  Although Nora signed a contract with DNR upon returning to the Philippines and has testified that he is willing to return to work at GIS *provided* that the circumstances there change (*e.g.*, such that he be allowed to work fewer hours "if I don't feel up

to it, or I just don't want to."),[16] he has also testified that he has spoken to no one from DNR in 2013 and that no one is currently recruiting him to work for D&R or GIS.[17]   Thus, it would be mere speculation to suppose that Nora will again be deployed to GIS.

The plaintiffs argue that this Court should follow cases wherein courts have permitted class actions to proceed even where the class representative's own personal claims have become moot during the litigation.[18]   However, the issue here is not one of mootness but one of standing. Because Nora has no realistic threat of future injury and had none when he first became a plaintiff in February 2013,[19] he lacks standing to bring a claim for injunctive relief and cannot fairly represent a class based upon such a claim.[20]   Moreover, even if standing were not lacking,

---

[16] *See* Rec. Doc. 401-23 at 17 of 46 ("...I would be willing to return and perform more work for [GIS] if DNR Offshore contacted me...and *if the circumstances changed*.") (emphasis added); Rec. Doc. 468-7 at 19 of 41 ("I will go back and work for them again *if they would correct what is right*, like the right salary, they will give us the right salary....") (emphasis added).

[17] *See* Rec. Doc. 468-7 at 6 of 41.

[18] *See* Rec. Doc. 517 at 60 of 72 (citing *U.S. Parole Comm'n v. Geraghty*, 455 U.S. 388, 398 (1980); *Newby v. Johnston*, 681 F.2d 1012, 1014 (5th Cir. 1982); *Satterwhite v. City of Greenville*, 634 F.2d 231, 231-32 (5th Cir. 1981); *Stewart v. Winter*, 669 F.2d 328 (5th Cir. 1982)).

[19] *See* Rec. Docs. 311 at ¶ 35, 468-7 at 6 of 41 (stating Nora last worked at GIS in August 2012, at which time he returned to the Philippines).

[20] *See, e.g., Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th 2011) ("Plaintiffs not employed by Costco throughout this case do not have standing to seek injunctive relief.  As former employees, [named class representatives] would not share an interest with class members whose primary goal is to obtain injunctive relief.  Thus, as the class currently stands, [they] will not adequately protect the interests of the class as a whole.")*; Drayton v. Western Auto Supply Co.,* 2002 WL 32508918 *4-5 (11th Cir. 2002) (citing *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1007 (11th Cir.1997)); *cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) ("'Past exposure to illegal conduct does not in itself show a present case or controversy

the plaintiffs have failed to demonstrate that Nora will adequately protect the interests of absentee class members, given that he has no personal stake in the injunctive relief sought.

Nora has other problems relating to standing because he has given conflicting testimony as to whether he was ever personally threatened with deportation while working at GIS.  When asked whether anyone ever threatened to deport him while employed by D&R, he answered unequivocally:  "Nobody did, no."  Rec. Doc. 468-7 at 19 of 41.  Later, on questioning by plaintiffs' counsel, he stated:  "When Randolf Malagapo called a meeting, he said to us when somebody becomes reckless in his job or do something that's against the rules, then we can get deported."  *Id.* at 25 of 41.  Even if the latter were interpreted as a threat against Nora,[21] it falls far short of supporting an inference that Nora ever provided labor that he otherwise would not have provided in response to or otherwise because of a threat of deportation.   Thus, the plaintiffs have failed to establish that Nora ever suffered the injury sought to be redressed by the Rule 23(b)(2) class.

As a last resort, the plaintiffs argue that they should be allowed to name a substitute representative.   However, even if the proposed Rule 23(b)(2) class were otherwise meritorious (which it is not, as discussed *infra*), the plaintiffs have failed to identify a single individual who has standing and is qualified to fairly represent absent class members.

---

regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.' " ) (quoting *Lyons*, 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974))).

[21]  Nora explained that the reckless behavior and rules violations referred to by Malagapo were smoking in non-smoking areas of the oil and gas platforms, fighting on the platforms, and walking on the highways instead of taking the company bus.  Rec. Doc. 468-7 at 25 of 41. Plaintiffs have pointed to no evidence that Nora personally had been engaging in any such behavior.

### 2.     Does the Rule 23(b)(2) Class Impermissibly Include Individual Claims for Money Damages?

The Supreme Court has held that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 131 S. Ct. at 2557.   Here, plaintiffs have attempted to navigate around this requirement by requesting certification of a class "seeking declaratory and injunctive relief only" for violations of RICO and the TVPA.   Rec. Docs. 400 at 2, 401-1 at 43 of 51.   Noting this, the defendants argue that this creates a conflict of interest between class representatives (each of whom has preserved a non-class damages claim under RICO and TVPA) and the absent class members.  *See* Rec. Doc. 473 at 49-50, 52 of 53 (citing *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 283 (5th Cir. 2008) (affirming district court in "declin[ing] to certify the class under Rule 23(b)(2) because individual claims for monetary relief would have predominated [and] conclud[ing] that the class representatives would be 'inadequate' if they dropped the class members' demand for compensatory and punitive damages in order to protect the 'predominance' of nonmonetary claims)); *see also Dukes*, 131 S. Ct. at 2560.   In response, plaintiffs argue that they have not sacrificed class members' claims for damages but "[i]n fact,...have expressly preserved the class member's individual rights to pursue money damages remedies, proposing that all of the class member's individual damages claims be presented in Phase Two...."  Rec. Doc. 517 at 66 of 72.   Plaintiffs cannot have it both ways.

First, plaintiffs' argument is directly contrary to the proposed class definition, which expressly limits the Rule 23(b)(2) class to those "seeking declaratory and injunctive relief only." Rec. Docs. 400 at 2, 401-1 at 43 of 51.   Phase II, in plaintiffs' motion to bifurcate, is designated

as a trial for class member damages on class and collective claims.   Rec. Doc. 400 at 1.[22]   Thus, by design, it would include only those claims certified as part of a Rule 23 class action or within the FLSA collective action.   To restate the obvious, plaintiffs have not sought class certification of any TVPA or RICO monetary damages claims.   Thus, monetary damages are not part of the proposed class action (at least as it is defined in the original motion papers), either for collective treatment or for bifurcated individual adjudication in a Phase II trial.   Prior to their reply memorandum, therefore, the plaintiffs had not "expressly preserved" the TVPA or RICO monetary damage claims of absentee class members.

Second, if the Court accepts the plaintiffs' attempt to redefine the Rule 23(b)(2) class, so as to include absent class members' individual claims for money damages for treatment in Phase II, then the class runs afoul of the rule enunciated in *Dukes* that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages."   *Dukes*, 131 S. Ct. at 2557.[23]   Plaintiffs do not dispute that class members' claims for money damages under RICO and the TVPA are individualized.   Indeed, they suggest that such claims "be presented in the Phase II damages proceedings,"[24] which is

---

[22]   Phase III is designated for non-class claims of *named* plaintiffs.  Rec. Doc. 401 at 1.

[23]   *See Dukes*, 131 S. Ct. at 2557-2561.  In light of the text and structure of Rule 23(b), as well as due process concerns, the *Dukes* court found "it clear that individualized monetary claims belong in Rule 23(b)(3)," with its predominance and superiority requirements protecting the rights of absentees, not in Rule 23(b)(2).  *Id.* at 2558.  Although it left open the question of whether relief that is "incidental to requested injunctive or declaratory relief"— *i.e.*, "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief" and which do "not require additional hearings to resolve the disparate merits of each individual's case"—may be permissible under Rule 23(b)(2), the Court expressly held that individualized damages claims are not.  *Dukes*, 131 S. Ct. at 2560, 2557.

[24]   Rec. Doc. 517 at 66 of 72.

defined in plaintiffs' proposed trial structure as determining "the amount of backpay and damages owed to the individual class members" and addressing "the distinct issues of how much time individuals actually worked under whatever policies are found to be unlawful in Phase I." Rec. Doc. 400-1 at 9 of 20.   Thus, the damages claims here would be plainly prohibited under Rule 23(b)(2).

Further supporting the conclusion that plaintiffs' invocation of Rule 23(b)(2) is simply an attempted end run around the predominance and superiority requirements of Rule 23(b)(3) is the very real concern that injunctive and declaratory relief may not even be permissible remedies under either the TVPA or RICO.   The TVPA is primarily a criminal statute, which provides a very limited and specific civil remedy:   "An individual who is a victim of a violation may bring a civil action against the perpetrator... and may recover damages and reasonable attorneys fees." 18 U.S.C. § 1595(a).   It is also "an 'elemental canon' of statutory construction that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies."   *Karahalios v. National Federation of Federal Employees, Local 1263,* 489 U.S. 527, 533 (1989).   "In such cases, '[i]n the absence of strong indicia of contrary congressional intent,' " a court is " 'compelled to conclude that Congress provided precisely the remedies it considered appropriate.' "   *Id.* (quoting *Middlesex County Sewerage Authority v. Sea Clammers*, 453 U.S. 1, 15 (1981)).   Plaintiffs have produced no indicia of contrary congressional intent. Thus, the Court must conclude that Congress provided exactly those civil remedies it deemed appropriate:  damages and attorney fees.

As for plaintiffs' RICO claims, the Fifth Circuit has expressed "considerable doubt that injunctive relief is available to private plaintiffs under RICO."   *Bolin v. Sears, Roebuck & Co.,*

231 F.3d 970, 977 n. 42 (5th Cir. 2000) (citing *Conkling v. Turner*, 18 F.3d 1285, 1296 n. 8 (5th Cir.1994) and *In re Fredeman Litigation*, 843 F.2d 821, 830 (5th Cir.1988).   Moreover, even if injunctive relief were available under RICO, plaintiffs have failed to explain how the RICO statute relates to the specific claims of the Rule 23(b)(2) class as delineated by the plaintiffs.  *See* Rec. Doc. 517 at 69-70 of 72.

> **3.     Lack of Classwide, Uniform Injury:**

Rule 23(b)(2) applies only where the defendant "has acted...on grounds that apply generally to the class."   Fed. R. Civ. P. 23(b)(2).   Thus, to come under Rule 23(b)(2), the targeted conduct much be "such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."   *Dukes*, 131 S. Ct. at 2557.   To meet this standard, an alleged pattern or practice "must consist of a uniform policy allegedly applied against the plaintiffs, not simply diverse acts in various circumstances."   *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 975 (5th Cir. 2000).   "Certification is improper if the merits of the claim turns on the defendant's individual dealings with each plaintiff."  *Id.*   Moreover, the injuries the class seeks to redress must be group injuries "as opposed to individual injuries."  *Bolin*, 213 F.3d at 975 n.22.   It is this "uniformity of the injury across the class" that "renders the notice and opt-out provisions of (b)(3) unnecessary."  *Id.*

Defendants argue that plaintiffs have produced evidence of only particularized and isolated threats of deportation — diverse acts in various circumstances — falling far short of the uniform policy with uniformity of injury required under Rule 23(b)(2).   The Court agrees. Outside of cookie-cutter, lawyer-drafted declarations, the plaintiffs' only evidence of deportation

threats relates to isolated instances by particular individuals, such as the meeting described by Nora, wherein Malagapo warned employees that they could be deported for reckless behavior and safety violations. *See* Rec. Doc. 468-7 at 25 of 41. Thus, for this additional reason, the Court finds that the claims presented are not appropriate for certification under Rule 23(b)(2).

**D.**     **Plaintiffs' Motion for Bifurcation under Rule 42(b):**

To the extent that plaintiffs' motion for separate trials relates to trial of Rule 23 class issues, it is moot in light of the Court's rulings on certification. Moreover, the Court agrees with the defendants that the plaintiffs' motion falls short of presenting a serious, workable trial plan. Thus, for this reason, the motion will be denied without prejudice insofar as it relates to the FLSA class claims. The parties shall confer and produce within thirty days a joint proposal for adjudicating the FLSA claims. Accordingly;

**IT IS ORDERED** that;

1)     Plaintiffs' Motion for Class Certification Pursuant to Fed. R. Civ. P. 23 **(Rec. Doc. 401)** is hereby **DENIED**, and plaintiffs' Motion for Separate Trials of Claims and Issues Pursuant to FRCP 42(b) **(Rec. Doc. 400)** is hereby **DENIED WITHOUT PREJUDICE**;

2)     Counsel for the parties to the FLSA collective action shall confer and submit within thirty (30) days a joint proposed trial plan for the FLSA claims.

New Orleans, Louisiana, this 18th day of November, 2013.

**KURT D. ENGELHARDT**
**UNITED STATES DISTRICT JUDGE**