**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ISIDRO BARICUATRO, JR.,  ET AL,<br><br>        Plaintiffs,<br>    v.<br><br>INDUSTRIAL PERSONNEL AND<br>MANAGEMENT SERVICES, INC., ET AL,<br><br>        Defendants. | **CLASS ACTION/COLLECTIVE ACTION**<br>Civil Action No.: 2:11-cv-02777-KDE-JCW<br>**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. PETER NICKERSON**<br><br>District Judge Section "N":    Judge Kurt D. Engelhardt<br><br>Mag. Judge Division 2:    Mag. Judge Joseph C. Wilkinson, Jr. |

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................. ii

I.   INTRODUCTION ....................................................................................................... 1

II.  BACKGROUND ......................................................................................................... 1

III. LAW AND ARGUMENT ........................................................................................... 3

   A.   Admissability of Expert Testimony ................................................................... 3

   B.   Burden shifting under *Anderson v. Mt. Clemens Pottery* .................................. 6

   C.   Defendants' attempts to impugn the reliability of Dr. Nikerson's report and testimony
        fail ..................................................................................................................... 10

      1.   Dr. Nickerson's qualifications are unchallenged ......................................... 10

      2.   Dr. Nicerson's methodology is sound ......................................................... 11

      3.   Defendants' challenges to Dr. Nickerson's report and testimony are properly made
           through cross-examination, not a motion to exclude ................................... 20

         a.   Dr. Nickerson's "understanding" of the data ........................................... 20

         b.   Use of data from certain Plaintiffs ......................................................... 21

         c.   Donning and doffing and travel time estimations .................................. 22

         d.   Housing deduction estimations .............................................................. 23

         e.   Credibility ............................................................................................... 24

CONCLUSION ................................................................................................................... 26

CERTIFICATE OF SERVICE ............................................................................................. 28

i

## TABLE OF AUTHORITIES

*Allison v. McGhan Med. Corp.*,
  184 F.3d 1300 (11th Cir. 1999) ................................................6

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946)................................................ passim

*Beliz v. W.H. McLeod & Sons Packing Co.*,
  765 F.2d 1317 (5th Cir. 1985) ................................................8, 9

*by McLaughlin v. Richland Shoe Co.*,
  486 U.S. 128 (1988)................................................8

*Calderon v. Presidio Valley Farmers Ass'n*,
  863 F.2d 384 (5th Cir. 1989) ................................................10

*Colindres v. QuietFlex Mfg.*,
  427 F. Supp. 2d 737 (S.D. Tex. 2006) ................................................9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)................................................ passim

*EEOC v. Gen. Tel. Co. of NW, Inc.*,
  885 F.2d 575 (9th Cir. 1989) ................................................20

*Garner v. Chevron Phillips Chem. Co., L.P.*,
  834 F. Supp. 2d 528 (S.D. Tex. 2011) ................................................9

*General Electric Co. v. Joiner*,
  522 U.S. 136 (1997)................................................3

*Giorgio v. Holland Am. Line, Inc.*,
  2006 U.S. Dist. LEXIS 27143 (W.D. Wash. April 4, 2006)................................................24

*Gomez v. Tyson Foods*,
  2013 WL 5516277 (D. Neb. Oct. 2, 2013) ................................................24, 25

*Humetrix, Inc. v. Gemplus S.C.A*,
  268 F.3d 910 (9th Cir. 2001) ................................................5

*Kudabeck v. Kroger Co.*,
  338 F.3d 856 (8th Cir. 2003) ................................................5

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)................................................4

*Lehrman v. Gulf Oil. Corp.*,
    500 F.2d 659 (5th Cir. 1974) ....................................................................6, 13

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001) ..................................................................6, 13

*Mathis v. Exxon Corp.*,
    302 F.3d 448 (5th Cir. 2002) ........................................................................23

*McLean v. 988011 Ontario, Ltd.*,
    224 F.3d 797 (6th Cir. 2000) ........................................................................23

*Mitchell v. Mitchell Truck Line, Inc.*,
    286 F.2d 721 (5th Cir. 1961) ........................................................................10

*Mitchell v. Reynolds*,
    125 F. Supp. 337 (W.D. Ark. 1954)................................................................8

*Moore v. Ashland Chemical Inc.*,
    151 F.3d 269 (5th Cir. 1998) ..........................................................................4

*Pipitone v. Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) ......................................................................5, 6

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
    382 F.3d 546 (5th Cir. 2004) ....................................................................5, 21

*Reeves v. Int'l Tel. & Tel. Corp.*,
    616 F.2d 1342 (5th Cir. 1980) ..............................................................8, 9, 10

*Rivera v. Ndola Pharmacy Corp.*,
    497 F. Supp. 2d 381 (E.D.N.Y. 2007) ............................................................9

*Rojas v. Marko Zaninovich, Inc.*,
    2011 WL 6671737 (E.D. Cal. Dec. 21, 2011) ..........................................25, 26

*Russell v. Whirlpool Corp.*,
    702 F.3d 450 (8th Cir. 2012) ..........................................................................6

*Skidmore v. Precision Printing and Pkg., Inc.*,
    188 F.3d 606 (5th Cir. 1999) ..........................................................................4

*St. Martin v. Mobil Exploration & Producing U.S. Inc.*,
    224 F.3d 402 (5th Cir. 2000) ..........................................................................5

*United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, Miss.*,
    80 F.3d 1074 (5th Cir. 1996) ..........................................................................5

*United States v. L.E. Cooke Co.*,
   991 F.2d 336 (6th Cir. 1993) ...............................................................................23

*Ventura v. Bebo Foods, Inc.*,
   738 F. Supp. 2d 8 (D.D.C. 2010) ...........................................................................9

*Von Friewalde v. Boeing Aerospace Ops., Inc.*,
   339 F. App'x 448 (5th Cir. 2009) ...........................................................................8

## STATUTES

29 U.S.C. § 211(c) .................................................................................................6

Fair Labor Standards Act ...........................................................................6, 8, 10

## OTHER AUTHORITIES

29 C.F.R. § 516.2(a) ...............................................................................................7

29 C.F.R. § 516.2(c) ...............................................................................................7

29 C.F.R. § 785.13 .................................................................................................7

51B C.J.S. Labor Relations § 1463 ......................................................................10

Federal Rule of Evidence 401 .................................................................................5

Federal Rule of Evidence 702 .........................................................................3, 4, 5

Federal Rule of Evidence 703 ...............................................................................24

## I.     INTRODUCTION

Defendants have asked this Court to exclude the testimony of Plaintiffs' damages expert, Dr. Peter Nickerson, for reasons that are contrary to well-established law governing the admissibility of expert witness testimony and, at best, are suited for cross-examination during a trial on the merits.  Dr. Nickerson is a qualified expert in his field.  His methodology for assessing economic damages in wage-and-hour cases is reliable and well accepted.  The crux of Defendants' motion is that the damages provided by Dr. Nickerson are unreliable because they are, in part, "estimates" and not exact calculations. These estimations are only necessary, however, because of the Defendants' incomplete and inconsistent pay data.  Defendants would realize this themselves, of course, had they actually attempted to calculate the alleged damages in this case, but instead they choose to attack various aspects of Dr. Nickerson's calculations, without explaining exactly how the issues they raise render Dr. Nickerson's entire methodology unreliable or biases his opinions in favor of Plaintiffs.  Plainly stated, Defendants' arguments go to the weight of Dr. Nickerson's testimony, not to its admissibility.

## II.    BACKGROUND

Plaintiffs have retained Dr. Peter Nickerson as an expert consultant and witness in this case. Dr. Nickerson is an economist and the principal of Nickerson & Associates LLC, a Seattle-based consulting firm specializing in economic and statistical analyses, especially analyses that require the use of large data sets.[1] Dr. Nickerson earned M.S. and Ph.D. degrees in Economics from the University of Washington.[2] Dr. Nickerson was a tenured professor of economics at Seattle University for thirteen years, and he continues to teach at the university level, most recently as an

---

[1] Nickerson Report, Appendix A, p.123.  Dr. Nickerson's expert report is attached as Exhibit A to Defendants' brief in support of their motion (Rec. Doc. 679-2).
[2] Nickerson Report, Appendix A, p. 129.

adjunct professor at New York University.[3] Dr. Nickerson has served as a consulting or testifying expert and worked on numerous wage-and-hour cases dealing with off-the-clock work, missed meal and rest breaks, and donning and doffing issues. Dr. Nickerson has qualified as an expert and testified in depositions and in trial in numerous federal and state courts.[4]

In this case, Dr. Nickerson was asked to estimate the following categories of damages:

1. The value of the unpaid time spent traveling to and from Defendants' onshore job sites on each onshore work day, plus the value of the unpaid time Plaintiffs spent traveling to and from Defendants' offshore job sites at the start of each period of offshore work and at the end of each period of offshore work, hereinafter referred to as the "Onshore and Offshore Travel Time."

2. The value of unpaid time Plaintiffs spent donning and doffing PPE and cleaning their tools and PPE at the end of the work day, hereinafter referred to as the "Don, Doff, and Clean Tools Time."

3. The value of the recorded and paid hours over 40 worked in a week that were not paid at proper overtime rates equal to one-and-one-half times the straight time rate, hereinafter referred to as the "Insufficiently Paid Overtime Hours."

4. The value of the difference between what Plaintiffs would have earned, had the Defendants not reduced their pay rates to minimum wage in approximately June of 2012, and what they were actually paid, hereinafter referred to as the "June 2012 Wage Reduction."

5. The value of Federal and Louisiana State tax refunds that Defendants allegedly kept from Plaintiffs, hereinafter referred to as the "Pilfered Tax Returns."

6. The value of the difference between the fair market value for room and board and the amount Plaintiffs were actually charged by Defendants, hereinafter referred to as the "Excess Housing Deductions."

7. The value of what Defendants charged Plaintiffs for the cost of work-related tools and equipment that Defendants ultimately retained, hereinafter referred to as the "Tool Deductions."[5]

---

[3] Nickerson Report, Appendix A. p.127-28.
[4] Nickerson Report, Appendix A. p.131.
[5] Nickerson Report, p. 116.

Dr. Nickerson's report sets forth all of the types of data that he used in making his estimates, how he used that data, and the nature of and bases for any assumptions that he made about that data.[6]

## III.    LAW AND ARGUMENT

### A.    Admissibility of expert testimony

The admissibility of expert testimony is governed by Rules 702 and 703 of the Federal Rules of Evidence and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (highlighting the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to "opinion" testimony). Rule 702 gives the district court considerable discretion to admit or exclude expert testimony. *See General Electric Co. v. Joiner*, 522 U.S. 136 (1997). Rule 702 provides that an expert witness "qualified . . . by knowledge, skill, experience, training or education," may testify when scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. Rule 702 requires that (1) the testimony be based on sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness apply the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.

In *Daubert*, the Supreme Court held that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that *Daubert* gatekeeping function applies to all forms of expert testimony). The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance. First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See*

---

[6] Nickerson Report, p. 8.

*Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 589. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id.* at 590. The district court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho* at 152.   However, "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150.   Whether an expert's testimony is reliable is a fact-specific inquiry.   *Skidmore v. Precision Printing and Pkg., Inc.*, 188 F.3d 606, 618 (5th Cir. 1999). Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence, in other words, whether it is relevant. *See Daubert*, 509 U.S. at 591. Federal Rule of Evidence 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

The Supreme Court has emphasized that a Rule 702 inquiry is "flexible" and that the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. As the Fifth Circuit has explained, the trial court's ruling should be supported by "adequately supported findings," *St. Martin v. Mobil Exploration & Producing U.S. Inc.*, 224 F.3d 402, 406 (5th Cir. 2000); but the court must not apply the reliability test so stringently as to "transform a *Daubert* hearing into a trial on the merits." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002). "[N]othing in Rule 702, Daubert, or its progeny requires

'that an expert resolve an ultimate issue of fact to a scientific absolute in order to be admissible.'" *Kudabeck v. Kroger Co.*, 338 F.3d 856, 861 (8th Cir. 2003) (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)). To the extent that a party challenges the probative value of the evidence, an attack upon the probative sufficiency of evidence relates not to admissibility but to the weight of the evidence and is a matter for the trier of fact to resolve. *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004).

In determining the admissibility of expert testimony, the court should approach its task with proper deference to jury's role as arbiter of disputes between conflicting opinions. *United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, Miss.,* 80 F.3d 1074, 1077 (5th Cir. 1996); *see also Humetrix, Inc. v. Gemplus S.C.A,* 268 F.3d 910, 919 (9th Cir. 2001) (the authority to determine the victor in a "battle of the expert witnesses" is properly reposed in the jury). The judge's role as a gatekeeper is not intended to supplant the adversary system or the role of the jury in which vigorous cross-examination, presentation of contrary evidence and careful instruction on burden of proof are means of attacking shaky but admissible evidence. *Daubert*, 509 U.S. at 596; *Pipitone* 288 F.3d at 250; *Russell v. Whirlpool Corp.*, 702 F.3d 450, 458 (8th Cir. 2012); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999).

When considering an expert's opinion of damages, as here, a district court must keep in mind that "while damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference." *Maiz v. Virani,* 253 F.3d 641, 666 (11th Cir. 2001), quoting G.M. Brod. & Co., Inc. v. U.S. Home Corp., 759 F.2d 1526, 1539 (11th Cir. 1985). "The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data." *Lehrman v.*

*Gulf Oil. Corp.*, 500 F.2d 659, 668 (5th Cir. 1974). This is especially true in light of the *Mt. Clemens* burden-shifting protocol that is applicable to FLSA cases, as discussed below.

  **B.**  <u>Burden shifting under *Anderson v. Mt. Clemens Pottery*</u>

  The FLSA requires employers to "make, keep, and preserve such records of the persons employed by [it] and of the wages, hours, and other conditions and practices of employment maintained by [it]. . . ."  29 U.S.C. § 211(c).  Specifically, regulations promulgated by the United States Department of Labor ("DOL") require an employer to maintain certain payroll data:

> (a) Items required.  Every employer shall maintain and preserve payroll or other records containing the following information and data with respect to each employee to whom section 6 or both sections 6 and 7(a) of the Act apply: ...
>
> > (5) ***Time of day and day of week on which the employee's workweek begins***…
> >
> > (7) Hours ***worked each workday*** and total hours ***worked each workweek*** (for purposes of this section, a "workday" is any fixed period of 24 consecutive hours and a "workweek" is any fixed and regularly recurring period of 7 consecutive workdays)....

29 C.F.R. § 516.2(a) (emphasis added).  Subsection 516.2(c) addresses employees working on a predetermined, set schedule:

> (c) Employees working on fixed schedules.  With respect to employees working on fixed schedules, an employer may maintain records showing instead of the hours worked each day and each workweek as required by paragraph (a)(7) of this section, the schedule of the daily and weekly hours the employee normally works.  Also,
>
> > (1) In weeks in which an employee adheres to this schedule, indicates by check mark, statement or other method ***that such hours were in fact <u>actually worked by him</u>***, and
> >
> > (2) In weeks in which more or less than the scheduled hours are worked, ***shows that <u>exact</u> number of hours worked each day and each week***.

29 C.F.R. § 516.2(c) (emphasis added).  Defendants did not comply with either of these requirements.

Employers also have an independent federal duty to account for all of the off-the-clock work performed by their employees:

> In all such cases it is the duty of the management to exercise control and see that work is not performed it does not want to be performed. It cannot sit back and accept the benefits without compensating them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

29 C.F.R. § 785.13. These code sections require employers of non-exempt employees to keep accurate time records of all hours worked.

The Supreme Court has recognized that placing this burden on the employer furthers the FLSA's remedial purposes, because "[e]mployees seldom keep such records themselves," and "even if they do, the records may be and frequently are untrustworthy." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946). Moreover, even if an employer delegates to his employees the duty of keeping records of hours worked, it cannot escape the record-keeping provisions of the FLSA. *Mitchell v. Reynolds*, 125 F. Supp. 337, 340 (W.D. Ark. 1954).

Normally, "an employee who brings suit for unpaid overtime compensation bears the burden of proving, with definite and certain evidence, that he performed work for which he was not properly compensated." *Reeves v. Int'l Tel. & Tel. Corp.*, 616 F.2d 1342, 1351 (5th Cir. 1980), *abrogated on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988). However, when an employer fails to satisfy its obligation to keep complete and accurate records of an employee's hours, "[t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." *Von Friewalde v. Boeing Aerospace Ops., Inc.*, 339 F. App'x 448, 455 (5th Cir. 2009). Rather, in such a situation an employee is deemed to have met his burden:

> if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent

7

> of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* (quoting *Mt. Clemens*, 328 U.S. at 687-88).

In other words, when an employer has failed to maintain adequate payroll records, "the employees' initial burden is to make out a prima facie case that the [FLSA] has been violated and to produce *some evidence* to show the amount and extent of the violation." *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1330 (5th Cir. 1985) (emphasis added); *see also Reeves*, 616 F.2d at 1351 ("Where the inaccuracy is due to the employer's failure to keep adequate records as required by statute, imprecise evidence on quantum can provide a 'sufficient basis' for damages." (emphasis added) (*quoting Mt. Clemens*, 328 U.S. at 687)). Applying this principle, courts have recognized that a plaintiff need not even provide documentary evidence to satisfy this burden. *See Garner v. Chevron Phillips Chem. Co., L.P.*, 834 F. Supp. 2d 528, 546 (S.D. Tex. 2011) (explaining that a plaintiff may meet his initial burden through "plaintiff's testimony as to when and how many overtime hours he worked, plaintiff's affidavit to such, etc."); *see also Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 8, 13 (D.D.C. 2010) ("When assessing damages under the *Anderson* standard, a court may draw inferences from oral testimony, sworn declarations, and whatever relevant documentary evidence a plaintiff is able to provide."); *Rivera v. Ndola Pharmacy Corp.*, 497 F. Supp. 2d 381, 388 (E.D.N.Y. 2007) (explaining that a plaintiff "may meet this burden by relying solely on his or her recollection" (*citing Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 335 (S.D.N.Y. 2005)).

In *Reeves*, for example, the Fifth Circuit upheld an award of unpaid wages that was based on the plaintiff's estimate of the average number of hours he worked each week, which

"corresponded to the rough computations of his subconscious mind." *Reeves*, 616 F.2d at 1352. Similarly, in *Beliz v. W.H. McLeod & Sons Packing Co.*, the Fifth Circuit held that a district court "was laboring [under] a misconception of the legal standard" when it denied the plaintiffs recovery "based on [their] inability to produce the 'definite and certain' evidence thought necessary by the district court." 765 F.2d at 1330. The workers' "admittedly inexact or approximate evidence" of hours was sufficient. *Id.*; *see also Colindres v. QuietFlex Mfg.*, 427 F. Supp. 2d 737, 752-53 (S.D. Tex. 2006) ("Evidence of hours worked need not be perfectly accurate as long as it provides a sufficient basis to calculate the number of hours worked by each employee.").

Under *Mt.* Clemens, once an FLSA plaintiff had made this initial showing, the burden shifts to the employer to come forward with "evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Mt. Clemens*, 328 U.S. at 687-88; *see also Reeves*, 616 F.2d at 1351(explaining that "[u]nder these circumstances [the Fifth Circuit has] 'in effect ordered the fact finder to do the best he could in assessing damages'" (quoting *Mitchell v. Riley*, 296 F.2d 614, 616 (5th Cir. 1961)); *Calderon v. Presidio Valley Farmers Ass'n*, 863 F.2d 384, 391 (5th Cir. 1989) (explaining that "[a]bsolute precision . . . would have been impossible" and holding that the trial court's "sound estimates [were] adequate"). Underlying this burden-shifting framework is the idea that "[t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records" in accordance with the Act. *Mt. Clemens*, 328 U.S. at 688; *see also Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721, 725-26 (5th Cir. 1961) (explaining that an employer "cannot really complain that matters are left in great uncertainty" due to its own failure to keep accurate time and wage records). Where there is "certainty of damage and the only uncertainty [is] to its extent," a court must simply do its best to

"to find some way in which damages can be awarded where a wrong has been done." *Id.*; *see also* 51B C.J.S. Labor Relations § 1463 ("Since uncertainty as to the measure or extent of damages does not bar recovery of damages, recovery under the Fair Labor Standards Act will not be precluded where the uncertainty lies only in the amount of damages arising from the statutory violation by the employer."

The *Mt. Clemens* burden-shifting principle applies in this case. As discussed below, Plaintiffs sought the assistance of Dr. Nickerson in estimating their damages in this case. Dr. Nickerson discovered that the records produced by Defendants are incomplete and unreliable and do not allow for simple arithmetic calculation of the amounts that Plaintiffs contend they are owed. In fact, according to Dr. Nickerson, the pay and hour records produced by Defendants qualify as "the worst case of record keeping [he has] seen in twenty years."[7] Accordingly, the admissibility of Dr. Nickerson's testimony must be viewed through the lens of the limited burden that Plaintiffs bear in this case. Defendants may not at once argue that Dr. Nickerson's damages "estimates" should not be admitted because they are "not actual calculations specific to each Plaintiff," when Defendants' shoddy recordkeeping makes such specific calculations impossible.

**C.   Defendants' attempts to impugn the reliability of Dr. Nickerson's report and testimony fail.**

**1.   Dr. Nickerson's qualifications are unchallenged.**

Defendants do not contend that Dr. Nickerson is not "qualified . . . by knowledge, skill, experience, training or education" to offer an expert opinion as to the amount of Plaintiffs' damages in this case. Indeed, Defendants' own expert, Dr. Jonathan Walker, acknowledged that Dr. Nickerson was qualified to do so.[8] Dr. Nickerson has worked on a number of wage-and-hour

---

[7] Nickerson Declaration ¶ 6.
[8] See Exhibit A, Walker Deposition, p. 14:23-15:13:
    Q. Your criticism is not about his qualifications?

cases dealing with allegations of off-the-clock work, missed meal and rest break complaints, and donning and doffing issues, and he has qualified as an expert and testified in depositions and in trial in numerous federal and state courts.[9]

### 2.    Dr. Nickerson's methodology is sound.

As discussed above, Dr. Nickerson's charge in this case was to take the payroll and other data provided by Defendants in discovery and calculate each plaintiff's damages as best he could from that data.[10] Dr. Nickerson approached this task in the same way that he has for other similar cases: he used available data to create, as accurately as possible, a database of hours worked, wage rates, actual payments to Plaintiffs for hours worked, and any other pay, vacation, benefit payments or charges that might be relevant to the case.[11] Once he created that database, Dr. Nickerson was able to calculate what Plaintiffs would be paid under various liability scenarios.[12] In this case, as in most others Dr. Nickerson has been involved with, the data that went into the database that he created came from Defendants' own electronic payroll and time keeping systems.[13]

In many cases such as this, in which Plaintiffs are hourly employees who believe they have been paid incorrectly, the relevant data are already part of company records, and Dr. Nickerson is able simply to look and see what formulae were used to calculate regular pay and the regular rate

---

A. No.
Q. Did you look at his CV?
A. Yes.
Q. And did you find him to be qualified, and a qualified economist by virtue of his background,training and experience?
A. I -- I saw that he is trained as an economist. The -- the issue of qualifications is generally in the courts, judges, not for me.
Q. Okay. But I'm -- I'm just asking your opinion, if you had looked at his CV and it – to me, it looks somewhat similar to yours. Would you assume that he is someone that -- that is qualified to render opinions, whether or not you agree with the methodology or those opinions?
A. I -- I don't have any reason to doubt his qualifications.

[9] Nickerson Report, p. 4; Appendix A.
[10] Nickerson Declaration ¶ 1.
[11] Nickerson Declaration ¶ 2.
[12] Nickerson Declaration ¶ 3.
[13] Nickerson Declaration ¶ 3.

of pay for overtime purposes and overtime pay.[14] When relevant data is unavailable from the employer's pay records, Dr. Nickerson has to rely on other sorts of records and other data to create a database that shows hours worked.[15] For example, in cases in which Plaintiffs are claiming missed meal or rest breaks or off the clock work before and after work shifts, Dr. Nickerson will supplement the company's existing time keeping and payroll data with deposition testimony and data from other sources in order to make damage calculations.[16]  Thus, as Dr. Nickerson testified repeatedly in his deposition, when the pay data provided by Defendants was sufficient to allow for an arithmetic calculation of a particular damage category, he used that data; and when the data provided by Defendants was incomplete or unreliable, he searched out the most reliable and accurate data he could use to estimate the amount of damages:

> A. So if –
> Q. -- and estimations?
> A. -- we have pay data for an individual, then we use that regular rate and that overtime rate to calculate what they were paid. And we also calculate what they would have been paid had they been paid how we think they should have been paid. If we don't have pay data for an individual, as we spoke about earlier, we use the median pay data for the people we had data for as a proxy for those people's data to calculate damages with."[17]
>
> A.  So what I need to be able to do in order to calculate a set of damages, I need to know either what a person was actually paid or I need to estimate what they were paid in a week. **If I have data on them, then I just use that data.** If I don't have data for that particular week, but it looks like they worked in that particular week, then I use the median number.
> . . . .
> You're only imputing income to people and pay to people if we don't have data for that week. **If we have data for that week, we use the actual data.**[18]

---

[14] Nickerson Declaration ¶ 4.
[15] Nickerson Declaration ¶ 5.
[16] Nickerson Declaration ¶ 5.
[17] Nickerson Deposition, p. 197. Dr. Nickerson's deposition transcript is attached as Exhibit B to Defendants' brief in support of their motion (Rec. Doc. 679-3).
[18] Nickerson Deposition, p. 200.

Courts have routinely recognized that using such an approach is an acceptable way to calculate damages.  *See Maiz*, 253 F.3d at 666; *Lehrman*, 500 F.2d at 668 ("The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data.").

Defendants contend, however, that Dr. Nickerson's methodology is unreliable because he is estimating damages and not providing an actual verifiable damage calculation for each Plaintiff.[19] This criticism is based on the assumption that Dr. Nickerson simply could have used the pay data provided by Defendants to accurately compute damages for every Plaintiff for the full statute period. That assumption is misleading, disingenuous, and simply not true. Plaintiffs do not dispute, of course, that, if Dr. Nickerson had complete and accurate pay data, he could precisely calculate damages in this case.  However, as Dr. Nickerson has observed, the pay data provided by Defendants in this case are, in fact, grossly incomplete and inaccurate and contain clear impossibilities and contradictions.[20] Dr. Nickerson has further observed that, assuming that Defendants have provided all of the pay and hour records that they have for Plaintiffs, this is "the worst case of record keeping [he has] seen in twenty years."[21]

Nevertheless, Defendants and their expert argue that Dr. Nickerson's analysis is unreliable because he relied upon payroll data to "estimate" hours worked, and he used medians or average values from the data to estimate damages for some individuals or some time periods, instead of using available data.[22] Dr. Walker described in his report the three types of data that he contends should be relied upon to estimate damages in this case:

> First are "trackers."  E-Visa trackers for workers with E-2 visas and Personnel on Board (POB) trackers for workers with B1-OCS visas provide a concurrent record of each worker's assigned job (or day off) and location by day.  Second, I understand that work tickets report employees' hours worked by day. Third, payroll

---

[19] Defendants' Motion at p. 2, 10.
[20] Nickerson Declaration ¶ 6.
[21] Nickerson Declaration ¶ 6.
[22]  Defendants' Motion at p. 10; Exhibit B, Walker Expert Report at p. 7.

reports such as pay stubs and perpetual history reports that list the compensation paid to employees during pay periods.[23]

Dr. Walker further outlined in his deposition how he would calculate damages in this case:

> Go to the perpetual history reports and go to the work tickets and go to the contracts and I assume we are talking the failure to pay time and a half is what over time is. Calculate – calculate based on the work tickets and discussions with each of these plaintiffs how many hours they worked in – in a give week and use the payroll report to see how much they were paid includes all types of pay and see whether they paid less than would have been pad if they would have been paid time and half.[24]

Dr. Walker admits in his deposition, however, that he made no attempt to calculate the damages using these data, and he has not even reviewed the data thoroughly to determine whether complete and reliable data are available to provide a basis to estimate each claimant's damages:

> Q. Do you know as we sit here today whether or not the data that has been produced in this case is complete?
> A. I don't know what the production has been.
> Q. Do you consider the data you have seen to be complete for all of the plaintiffs in this case?
> A. I have not looked at all the data that we have, so I couldn't answer that.[25]

Dr. Nickerson agrees that, if these three types of data completely and reliably captured work locations, worked hours, and amounts paid, then he could rely solely on them for a damage estimate and he could calculate precise damages for every individual with no estimation.[26] However, these three sources of data are far from complete or accurate.[27] Had Dr. Walker conducted even a cursory review of the data produced, he would have realized that calculating damages for all Plaintiffs is impossible without applying some reasonable estimates, because the necessary data are not available or are inconsistent for some Plaintiffs. In fact, Dr. Nickerson notes

---

[23] Walker Report, p. 7.
[24] Walker Deposition, at p. 89:04-14.
[25] Walker Deposition, at p. 125:22-126:05.
[26] Nickerson Declaration ¶ 7.
[27] Nickerson Declaration ¶ 8.

that *none* of the three types of data Dr. Walker says are necessary to compute damages are available for every Plaintiff and most of the Plaintiffs have at least one type of data that is incomplete.[28] Therefore, it was appropriate for Dr. Nickerson to apply reasonable assumptions to estimate for some Plaintiffs how many hours they worked, where they worked, and how much they were paid.

To illustrate the problems he faced in dealing with the pay data provided by Defendants in this case, Dr. Nickerson has detailed in his attached Declaration certain aspects of the data Defendants provided for Plaintiff Noel Mallari.  It appears that Mr. Mallari had at least nine separate work periods working for the Defendant. The following reflects Dr. Nickerson's observations regarding the available data for Mr. Mallari in each of these periods.

- Period 1: There are perpetual history reports from D&R payroll records that have period ending dates of 03/31/2007, 04/30/2007, 05/31/2007, 06/30/2007, and 07/31/2007 each with some number of regular hours, overtime hours, or training hours.  It is not clear what days of work these pay periods correspond to but it may be that each cover the corresponding month and thus Mr. Mallari was employed from approximately 03/01/2007 to 07/31/2007. The Defendants have provided no records that show hours worked or where Mr. Mallari worked during this period; estimates must be used.

- Period 2: There are perpetual history reports from D&R payroll records that have period ending dates of 01/31/2008, 02/29/2008, 03/31/2008, 04/30/2008, 05/31/2008, and 06/30/2008.  The first pay period, 01/31/2008 contains only an extension bonus and has no regular or overtime hours in this pay record. The remaining pay periods each contain some number of regular hours and overtime hours.  It is not clear what days of work these pay periods correspond to, but it may be that each covers the corresponding month and thus Mr. Mallari was employed from approximately 02/01/2008 to 06/30/2008. The Defendants have provided no records that show hours worked or where Mr. Mallari worked during this period; estimates must be used.

- Period 3: There are perpetual history reports from D&R payroll records that have period ending dates of 09/30/2008, 10/31/2008, 11/30/2008, 01/20/2009, and 2/10/2009 with some number of regular hours and overtime hours. It appears that beginning in 2009 the period end dates do not reliably represent the actual end of the pay period and instead the "period end date" of 1/20/2009 corresponds to work conducted in December of 2008.[29] Thus the pay record for period end date 2/10/2009, which only contains 10 hours, most likely indicates that Mr. Mallari worked only one day in the month of January, 2009.  Mr. Mallari also received a check with a period end date of 9/18/2008 with a description of

---

[28] Nickerson Declaration ¶ 7.
[29] Deposition of Hecton Lanasse, III taken on June 24, 2014, page 44.

"Regular". This check had a rate of $400 but included zero hours.  Therefore, it is not clear whether this was actually an extension or rejoin bonus or if this was pay he received for hours worked.  The tracker data for this period do not start until October 2008 but the bunkhouse data, which also track location, show Mr. Mallari arrives from the Philippines on 09/09/2008.  The bunkhouse data also show Mr. Mallari departs to a location "MP-41" on 09/17/2008 and the data show he arrives from "MP-41" on 09/30/2008. Even though a combination of tracker and bunkhouse data identify where he worked in 2008, the Defendant has not provided records that show how many hours Mr. Mallari worked prior to 1/1/2009; estimates must be used.

- Period 4:  The tracker data show Mr. Mallari "Coming in from Philippines" on 02/15/2009 and "Going Home" on 07/15/2009.  There are perpetual history reports from D&R payroll records with some number of regular hours, overtime hours, or training hours on period end dates 03/18/2009, 04/19/2009, 05/18/2009, 06/10/2009, 07/13/2009 and 08/11/2009. There are inconsistencies between work ticket and tracker data throughout this period. For instance, from 02/20/2009 to 04/09/2009 the tracker data show Mr. Mallari as "Perdido Standby," yet the work ticket data bill 8 hours to either Shell International or Shell Oil Company and 4 hours to Grand Isle Shipyard for a total of 12 hours each day.  Did Mr. Mallari work 8 hours for Shell these days even though the tracker data show Mr. Mallari on "standby"?  These types of inconsistencies between tracker and work ticket data are also observed throughout the month of April 2009.

  There are no tracker data in May of 2009[30], but the bunkhouse data show Mr. Mallari departing to "Perdido" on 5/7/2009. On 6/1/2009 the tracker data show Mr. Mallari working on the "Perdido Project", but it is unclear whether Mr. Mallari worked the entire period between 5/8/2009 and 6/1/2009 at Perdido. The work ticket shows Mr. Mallari working at "Alamos Canyon 857 Perdido" during this period, but the work ticket data is an unreliable indicator of location.[31]

- Period 5:  The tracker data show Mr. Mallari "Coming in from Philippines" on 05/26/2010 and "Going Home" on 11/22/2010.[32]  There are perpetual history reports from D&R payroll records with some number of regular hours on period end dates of 06/18/2010, 07/22/2010, 08/20/2010, 09/25/2010, 10/22/2010, 11/16/2010, and 12/19/2010 and there are continuous work ticket data for this period.

- Period 6:  The tracker data show Mr. Mallari "Arriving from Manila" on 01/04/2011. There are no tracker data showing when Mr. Mallari departs to the Philippines but the bunkhouse data show a departure date of 05/19/2011. From 04/01/2011 to 05/17/2011 there are no

---

[30] In fact, there are no tracker data available in May of 2009 for any of the 8 plaintiffs being tried on August 11, 2014.

[31] The work ticket data show Mr. Mallari working at "Alamos Canyon 857 Perdido" for all of April and March, which conflicted on numerous occasions with both the tracker and bunkhouse reports.

[32] The tracker data contain a "Date Arrived" and a "Date Home" field that are separate from the daily assignment locations. I have found that the "Date Home" date and the date the daily assignment locations (daily tracker data) indicate persons leave are often inconsistent. Mr. Mallari's daily tracker data show him leaving the United States on 11/22/2010, yet the "Date Home" field showed a date of 9/25/2010 until it was updated to 11/24/2010, which is still not consistent with the daily tracker data.

tracker data but there are work ticket data for Mr. Mallari. The "Date Home" field in the tracker data shows Mr. Mallari departing on 05/03/2011, which conflicts with both the bunkhouse reports and the work ticket data.  Additionally, there are perpetual history reports from D&R payroll records with some number of regular hours on period end dates 02/24/2011, 03/30/2011, 04/14/2011, 05/20/2011, and 06/20/2011. The Defendants have not provided complete records that show where he worked during this period; estimates must be used.

- Period 7:  The tracker data show Mr. Mallari "Coming in from Philippines" on 06/22/2011 and "Going Home" on 12/15/2011.  There are work ticket data for these dates.  There are perpetual history reports from D&R payroll records with some number of regular and overtime hours on period end dates of 07/18/2011, 08/17/2011, 09/28/2011, 10/27/2011, 11/28/2011, 12/16/2011, and 1/25/2012.

- Period 8:  The tracker data show Mr. Mallari at the "Airport" on 01/14/2012 and "Going Home" on 05/13/2012.  From 04/04/2012 to 04/16/2012 the tracker data list Mr. Mallari as "working with Toby" yet no hours are credited in the work ticket data.  This is inconsistent with other periods such as 06/21/2010 to 11/21/2010 where he is listed with this assignment and credited with time in the work ticket data.  Did he or did he not work? From 04/17/2012 to 04/18/2012 tracker data show Mr. Mallari as "training" yet these days are missing from the work ticket data.  There are perpetual history reports from D&R payroll records with some number of regular hours or overtime hours on period end dates 01/25/2012, 02/22/2012, 03/28/2012, 04/23/2012, 05/21/2012, 06/05/2012, 06/12/2012 and 06/13/2012.  It is not clear whether the pay check with the period end date of 1/25/2012 is actually associated with work done in December of 2011 during Mr. Mallari's previous period of employment, whether it is associated with work done since the beginning of this period of employment, or whether it is for work conducted in both periods of employment. Around June of 2012 it appears that D&R began paying its employees on a weekly basis though it is not clear whether the period end date in fact corresponds to the end of the week covered by the pay check. For example, the pay record with a pay period end date of 6/12/2012 notes Mr. Mallari worked 40 regular hours, while the pay record with a pay period end date on the very next day, 6/13/2012, notes Mr. Mallari working 80 regular hours. It is unclear whether the pay records for pay periods ending 06/05/2012, 06/12/2012, and 6/13/2012 apply to the month of May or weeks in June. Even Dr. Walker, when questioned in his deposition, did not know how to interpret these records.[33]

- Period 9:  The tracker data show Mr. Mallari "Coming in from Philippines" on 06/06/2012 and "Going Home" on 09/25/2012. There are perpetual history reports from D&R payroll records with some number of regular hours and overtime hours beginning on pay period end date 06/05/2012 and ending 10/12/2010. The pay records exhibit many inconsistencies during this period. As noted previously, it is unclear if the pay records for 06/05/2012, 06/12/2012, and 06/13/2012 are for work periods in May or June. It appears as though Mr. Mallari is paid for 12 regular hours in pay period ending 6/5/2012. This conflicts with the tracker data as the tracker data do not show Mr. Mallari arriving from the Philippines until

---

[33] Deposition of Jonathan Walker, pp 158-160

6/6/2012. The pay records are often out of sequence during this period and multiple pay records cover the same period end dates. For example, there are two pay records for period end date 7/31/2012, each with 40 regular hours worked. The first pay record has a check date of 7/31/2012 and the second pay record has a check date of 8/14/2012. Between these two check dates for pay period ending 7/31/2012, Mr. Mallari pay records show him receiving another check on 8/13/2012 for pay period end date 7/24/2012. The pay records also show two pay records for pay period end date 9/17/2012. The work ticket data do not start until 06/10/2012, four days after the tracker data show Mr. Mallari arriving from the Philippines, therefore, I do not know the number of hours worked (if any) from 06/07/2012 to 06/09/2012. Additionally, the tracker data show Mr. Mallari going to "Going out to Perdido" on 07/02/2012 but there is no work ticket data on this date.

Similar to period 4, there are inconsistencies between the work ticket data and the tracker data. For example, from 09/05/2012 to 09/11/2012 Mr. Mallari is credited with 84 hours which are billed to Shell Oil Company and his tracker data lists him as "Auger Standby". On 09/02/2012, 12 hours are billed to Shell Oil Company but the tracker data show Mr. Mallari's location as "cancelled".  It is unclear both where, or if, he worked those days given that time was billed to a client.   There are other examples in the period where he is listed as "Auger Standby" and time is credited towards both Shell Oil Company and Internal Project Customer.[34]

Dr. Nickerson has observed numerous other problems with Defendants' data as well, including inconsistencies between the work ticket data, tracker data, and bunkhouse reports.[35] For example, Dr. Nickerson notes that, on 04/13/2009 to 04/19/2009, 04/21/2009 to 04/25/2009, and 04/27/2009 to 05/06/2009, the work ticket data show on average 8 hours billed to Shell Oil Company.[36] During the same periods, the tracker data show Mr. Mallari on "Perdido Standby," yet the bunkhouse data show Mr. Mallari assigned to "Marks House."[37] Further, both Samuel Nora and Mr. Mallari are noted as being on "Perdido Standby" in the tracker data on 6/7/2009, but both individual's bunk data show them "Washing Buses."[38]

Dr. Nickerson further notes that, with the data the Defendants have provided, it is often not possible to accurately determine the claimants work status when the POB trackers and E-Visa

---

[34] Nickerson Declaration ¶ 8.
[35] Nickerson Declaration ¶ 9.
[36] Nickerson Declaration ¶ 9.
[37] Nickerson Declaration ¶ 9.
[38] Nickerson Declaration ¶ 9.

trackers designated the claimant's work assignment as "standby," "on call" or other similar designations, because the bunkhouse reports and work ticket data often show the same claimants as working during these times.[39]

Dr. Nickerson also points out that some data provided by Defendants is clearly wrong.  For example, on 4/2/2009, Rosauro Dimalanta was credited with working *28 hours*; on 1/28/2009 Doy Sarmiento was credited with *28 hours*; on 5/6/2009 Avelino Tajonera was credited with *28 hours*; on 2/21/2012 Nilo Valenciano was credited with *34 hours*, on 4/10/2012 Edgar Montil was credited with *26 hours*; on 7/7/2009 Ferdinand Garcia is credited with working *24 hours*; on 10/25/2011 Edgar Montil is credited with *24 hours*, on 1/14/2009 Randy Cabuenas is credited with *24 hours*.  It is simply not possible for these individuals to work the hours reported.[40]

Dr. Nickerson observes that the above examples are not the exception; they are the rule, and that it is simply impossible to calculate damages using the methodology suggested by Dr. Walker in his report.[41] In fact, Dr. Walker admits in his deposition that he would potentially apply estimates if the data were not available:

> Q. What about the data is not complete.  Would that be another reason that would perhaps have to do some estimating?
> A. Potentially.[42]

Given the incomplete and inaccurate pay data provided by Defendants, there is no other way to calculate damages in this case other than to make reasoned estimates and extrapolations, and Dr. Nickerson's doing so in this case was perfectly appropriate and does not render his opinion unreliable — especially in light of the fact that Plaintiffs need only produce evidence sufficient to

---

[39] Nickerson Declaration ¶ 10.
[40] Nickerson Declaration ¶ 11.
[41] Nickerson Declaration ¶ 11.
[42] Walker Deposition, at p. 125:18-21.

show their damages "as a matter of just and reasonable inference" to meet their burden of proof in this case. *Mt. Clemens*, 328 U.S. at 687.

### 3. Defendants' challenges to Dr. Nickerson's report and testimony are properly made through cross-examination, not a motion to exclude.

In addition to challenging Dr. Nickerson's report and testimony on the basis that his damages calculations are "estimates," Defendants also contend that Dr. Nickerson's opinions and estimates are based on incorrect assumptions or data. Each of Defendants' positions is addressed below, but, ultimately, these challenges amount to nothing more than fodder for Dr. Nickerson's cross-examination, not a basis for excluding his testimony. Moreover, Defendants' argument that Dr. Nickerson's opinion is based on "altered facts and speculation designed to bolster [Plaintiffs'] position"[43] is merely a conclusory assertion from counsel. Defendants have not attempted to explain — much less demonstrate with their own analysis — how the facts and assumptions that they question have biased Dr. Nickerson's opinion in Plaintiffs' favor. *See EEOC v. Gen. Tel. Co. of NW, Inc.*, 885 F.2d 575, 580 (9th Cir. 1989) ("When statistical evidence is challenged on methodological grounds, the burden should be on the challenger to present evidence that the statistics are defective and how that flaw biases the result.").

### a. Dr. Nickerson's "understanding" of the data

Defendants contend that Dr. Nickerson's opinion is unreliable because he purportedly admitted that he did not "understand the data."[44] In support of that contention, Defendants present a series of excerpts from Dr. Nickerson's deposition, in which expressed difficulties he had in assessing Defendants' pay data. Defendants attempt to portray any confusion or uncertainty Dr. Nickerson expressed as to the nature or quality of Defendants' pay data as evidence that he could

---

[43] Defendants' Motion at pp. 5, 12.
[44] Defendants' Motion at p. 5.

not (and did not) produce reliable estimates of Plaintiffs' damages. Defendants both misconstrue Dr. Nickerson's testimony and fail to state a viable reliability challenge.

First, Dr. Nickerson understands perfectly well what the Defendants purport their data to be, but he does not "understand" that data, to the extent that it is incomplete, inconsistent, and, in some cases, clearly wrong.[45] Further, Dr. Nickerson's failure to fully understand certain of Defendants' specific field codes is unremarkable, in that Defendants did not provide full field layouts or descriptions of each of the specific terms they used. More importantly, however, Defendants make no attempt whatsoever to demonstrate how Dr. Nickerson's purported lack of understanding of certain terms or his exclusion from his report of certain categories of data — the reasons for which are all set forth in detail in his report — actually made his estimates either materially inaccurate or skewed in favor of Plaintiffs. If Defendants cannot show that Dr. Nickerson's failure to understand the data actually rendered his methodology unreliable in some way, Defendants' arguments simply do not amount to an adequate basis for a *Daubert* challenge. *See Primrose Operating Co. v. Nat'l American Insurance Co*., 382 F.3d 546, 562 (5th Cir. 2004) (holding that to the extent that an attack upon the probative sufficiency of evidence relates not to admissibility but to the weight of the evidence and is a matter for the trier of fact to resolve).

### b.    Use of data from certain Plaintiffs

The same is true of Defendants' argument that Dr. Nickerson's inclusion of data from certain Plaintiffs rendered his entire methodology for estimating damages unreliable.  Simply put, Defendants raise a statistical issue that is properly explored on cross-examination, not in a *Daubert* motion. Defendants present no evidence that the means and medians that Dr. Nickerson uses in his calculations are materially inaccurate, much less biased in favor of Plaintiffs, as a result of the

---

[45] Nickerson Declaration ¶ 9-11.

inclusion of data from the parties Defendants contend were improperly included. With respect to the inclusion of data from Erwin Realin in Dr. Nickerson's calculations, counsel for Plaintiffs notes that Dr. Nickerson simply used Defendants own pay data for Mr. Realin as part of his determination of median figures to be used as the bases for estimates, when such estimates are necessary to supplement of incomplete or inconsistent data. As such, that data is not being used by Plaintiffs to conclusively prove anything, it is simply part of a large data set from which certain estimations are derived. More importantly, this issue is wholly immaterial to Defendants' motion to exclude Dr. Nickerson's testimony, as Defendants have not shown how Dr. Nickerson's inclusion of Mr. Realin's data in his calculations renders those calculations either unreliable or biased in favor of Plaintiffs.

### c.       Donning and doffing and travel time estimations

Defendants also contend that Dr. Nickerson's method of estimating Plaintiffs' unpaid donning and doffing or travel time was inherently unreliable. Specifically, they contend that Dr. Nickerson's assumption that Plaintiffs spent five minutes donning and doffing their PPE and cleaning their tools each work day renders his entire methodology for estimating Plaintiffs' damages inadmissibly unreliable. This is yet another discrete statistical issue masquerading as a *Daubert* challenge. Despite Defendant's incorrect statement to the contrary, Dr. Nickerson is not "purporting to testify as an expert regarding the time it took them to 'don and doff' their PPE."[46] Instead, Dr. Nickerson made clear at his deposition that he is "not an expert on donning and doffing" and that he is simply basing his calculation on an estimate based on deposition testimony and other sources.[47] As this Court is aware, expert witnesses routinely offer opinions based on assumptions that are subject to evidentiary testing at trial. And even though the inaccuracy of those

---

[46] Defendants' Motion at p. 15.
[47] Defendants' Motion at p. 15.

assumptions may affect the probative value of the expert's testimony, they do not render that testimony inherently unreliable. An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000). However, mere "weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993).

The same is true for Dr. Nickerson's travel time estimations. Defendants challenge Dr. Nickerson's use of ten minutes as an assumed round-trip travel time for Plaintiffs when accurate data was not available, and they challenge his use of Google Maps as a source of information. However, even if Defendants are correct, and they are able to produce contrary evidence at trial, they will only diminish the *weight* of Dr. Nickerson's testimony, not the reliability of his methodology. *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461, (5th Cir. 2002) (holding that expert's method for defining geographic market was admissible even though it was "marginally under-or over-inclusive"). Moreover, Defendants do not undertake to perform their own "correct" calculations or to otherwise demonstrate how Dr. Nickerson's calculations were materially inaccurate and biased in favor of Plaintiffs.

### d.   Housing deduction estimations

Defendants also attack Dr. Nickerson's estimates of the amount of the improper housing deductions that Defendants charged to Plaintiffs. Specifically, Defendants argue that Dr. Nickerson improperly relied on the market-rate rental study prepared by another expert, without independently verifying the bases for that report, and used $15 as his estimate of the daily fair market value for food without a sufficient basis for that figure. Defendants have pointed to no authority requiring an expert witness to independently assess or verify the data provided to him by

Plaintiffs' counsel. Indeed, Federal Rule of Evidence 703 contemplates that experts will rely upon information provided to them by others, and nothing in the Federal Rules requires an expert witness to "independently assess or verify" the data provided by counsel. *See* FRE 703("An expert may base an opinion on facts or data in the case that the expert *has been made aware of* or personally observed.") (emphasis added); *see also Giorgio v. Holland Am. Line, Inc.*, 2006 U.S. Dist. LEXIS 27143, *7 (W.D. Wash. April 4, 2006) ("Unlike other witnesses, expert witnesses need not have personal knowledge of the facts underlying their opinions."). Once again, Defendants will have ample opportunity to attack the factual basis underlying any of the specific statistical assumptions that Dr. Nickerson made in his estimations. But even if Defendants could do so definitively at this point, it would simply make Dr. Nickerson's testimony unconvincing; it would not render his methodology so unreliable as to warrant its exclusion.

### e. Credibility

Finally, Defendants attempt to impugn Dr. Nickerson's credibility based on his assertion in his deposition that he had never had an expert report or testimony rejected by a court.  In support of their attack on Dr. Nickerson's truthfulness, Defendants cite *Gomez v. Tyson Foods*, 2013 WL 5516277 *5 (D. Neb. Oct. 2, 2013), as evidence that a court had in fact rejected an expert report by Dr. Nickerson. Defendants grossly mischaracterize the court's ruling in that case.  The court in *Gomez* ruled that (1) Dr. Nickerson was not allowed to testify because he was not properly offered as an expert witness, and (2) his calculations of damages were not excluded from evidence but were rejected by the court after full consideration:

> At trial, Tyson attempted to present Dr. Nickerson as a Rule 1006 witness with respect to evidence related to punch times, but the court found he was in fact an expert witness and *had not provided an expert report* to the plaintiffs either by the expert-report deadline or before trial, so he was not permitted to testify.
> . . . .

> The court *has considered Dr. Nickerson's criticisms* of Dr. Fox's calculations and finds they lack merit. The court has rejected Tyson's contention that the class is limited to those hired before the class certification date. Supra at 5 n.4. The court rejects the offsets proposed in Dr. Nickerson's analysis.

*Id.* at *5, *17 (emphasis added). Dr. Nickerson offered no expert opinion in that case, and thus the court did not "reject" any expert report or testimony from him.

Defendants also contend that Dr. Nickerson's expert opinion in *Rojas v. Marko Zaninovich, Inc.*, 2011 WL 6671737 (E.D. Cal. Dec. 21, 2011), undercuts his credibility in this case. Specifically, Defendants suggest that Dr. Nickerson, who had been retained by the defendant, criticized the plaintiff's expert "for doing the same thing Dr. Nickerson did in this case."[48] Defendants again mischaracterize Dr. Nickerson's statements. In *Rojas*, the plaintiff's expert had a complete set of payroll and time keeping data for every employee across the full statute period.[49] These would have allowed him to exactly calculate alleged damages for every employee for the full time period.[50] He also had another set of complete data against which he could verify and cross check his understanding of how the payroll and timekeeping data work.[51] Furthermore, he had clear deposition testimony from 30(b)(6) witnesses stating exactly how the data worked.[52] The expert nevertheless ignored the data instructions in the deposition and ignored the data that would allow him to cross check his understanding and as a result miscalculated damages.[53] In this case, however, Dr. Nickerson has found gaping holes in every type of data needed to calculate damages.[54] There is no contradiction between his testimony in *Rojas* and his testimony here.

---

[48] Defendants' Motion at p. 24.
[49] Nickerson Declaration ¶ 12.
[50] Nickerson Declaration ¶ 12.
[51] Nickerson Declaration ¶ 12.
[52] Nickerson Declaration ¶ 12.
[53] Nickerson Declaration ¶ 12.
[54] Nickerson Declaration ¶ 9-11.

## CONCLUSION

For all the foregoing reasons, Defendants' Motion to Exclude Expert Testimony of Dr. Peter Nickerson should be denied.

Dated: July 15, 2014                    Respectfully submitted,

/s/ Peter B. Schneider
Carolyn H. Cottrell (*pro hac vice*)
Todd M. Schneider (*pro hac vice*)
Peter B. Schneider (*pro hac vice*)
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
180 Montgomery Street, Suite 2000
San Francisco, California 94104
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
ccottrell@schneiderwallace.com
pschneider@schneiderwallace.com

Joseph C. Peiffer (La. Bar No. 26459)
David M. Abdullah (La. Bar No. 27349)
PEIFFER ROSCA ABDULLAH
   CARR & KANE, LLC
201 St. Charles Avenue, Suite 4610
New Orleans, LA 70170
Telephone: 504-523-2434
Facsimile: 504-523-2464
jpeiffer@praclawfirm.com
dabdullah@praclawfirm.com

Ellaine A. Carr (*pro hac vice*)
ELLAINE CARR & ASSOCIATES, PLLC
2434 Pass Road, Suite A
Biloxi, Mississippi 39531
Telephone: (228) 273-4410
Facsimile: (866) 929-9201
ecarr@ellaineecarrlaw.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served on all of record via the ECF system on July 15, 2014.

<u>/s Peter B. Schneider</u>